**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **Wesley Spratt** | : | |
| | : | |
| **vs.** | : | **C.A. No.: 04-112S** |
| | : | |
| **Department of Corrections;** | : | |
| **A.T. Wall** | : | |

**MEMORANDUM ADDRESSING HOW THE RESTRICTION ON PLAINTIFF'S SUPERVISED PREACHING IS THE "LEAST RESTRICTIVE MEANS" OF FURTHERING THE DEPARTMENT OF CORRECTIONS' SECURITY INTEREST**

Now comes Defendant A.T. Wall and hereby responds to this Court's October 18, 2005 Order in which the Court ordered the Defendant to detail how the restriction on Plaintiff's unsupervised preaching is the "least restrictive means" of furthering the Department of Corrections' security interest.

I. The "least restrictive means" test

Plaintiff has sued the Department of Corrections' Director after he was prohibited from acting as an inmate preacher to an inmate congregation. Under the Religious Land Use of Institutionalized Persons Act, (RLUIPA), 42 U.S.C. § 2000cc, substantial burdens on religious exercise will only be sustained if they further a compelling state interest in the least restrictive manner. In cases that have discussed the "least restrictive manner" factor, it has been shown that if some level of compromise can be effectuated between the inmate's religious request, and the prisons' security concerns, then a "least restrictive manner" exists.

II. The prohibition on inmate preachers furthers a compelling state interest in the least restrictive manner; there is no method of accommodating Plaintiff's request to preach to an inmate congregation that would not impact the valid security concerns of the Department of Corrections

The Plaintiff at bar is seeking authorization to act as a leader of religious services within the Maximum- security facility of the ACI. Counsel has been unable to find any case from any jurisdiction that has sustained a prisoner's challenge to a prison's prohibition of this activity. To permit a prison inmate to hold such a leadership position would risk the safety and security of the institution itself. If the Plaintiff preached to the inmate congregation under the supervision of the Department, concerns about the content of Plaintiff's preaching as it relates to prison security could be somewhat alleviated (although not entirely, as it is possible that an inmate preacher could use a code or signal to communicate to the inmate population during his "sermons") however the Department would still be left in the position of Plaintiff being elevated to a position of leadership or perceived leadership within the inmate population. That position or the perception of that position presents a significant risk to inmate security that it unacceptable to the Defendants.

In *Morrison v. Cook*, 1999 WL 717218 (D.Or.) the U.S. District Court for the District of Oregon addressed a claim by a prison inmate who wished to lead religious services within the prison:

> Plaintiff appears to be challenging the constitutionality of a rule banning inmate-led religious activities in Oregon prisons. **This type of claim, however, has been rejected by virtually every court that has considered the question.** *See, e.g., Benjamin v. Coughlin*, 905 F.2d 571, 577-578 (2nd Cir.), *cert. denied*, 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990); *Cooper v. Tard*, 855 F.2d 125, 129 (3rd Cir. 1988); *Johnson-Bey v. Lane*, 863 F.2d 1308 (7th Cir.1988) (a prison "need not yield to their desire to invite convicted felons, frocked or unfrocked, to conduct religious services in the prison"). *Morrison* at 10. [Emphasis added].

The Seventh Circuit has held that "[a]llowing prisoners to lead religious services also gives them a greater position of authority over other inmates than do many other leadership positions." *Hadi v. Horn*, 830 F.2d 779, 785 (7th CIR. 1987). See also, *Anderson v. Angelone et al.*, 123 F.3d 1197, 1198 (9th CIR. 1997) ("[P]rohibition on inmate-led religious services does not violate the First Amendment. Requiring an outside minister to lead religious activity among inmates undoubtedly contributes to prison security.")

Because religious services are in fact being provided to the inmate population, including the Plaintiff, the Defendant is furthering a compelling state interest (i.e., prison security) in the least restrictive manner. There is simply no way to permit the Plaintiff, or any other inmate for that matter, to hold a position of authority before an inmate congregation. (See Affidavit of Jake Gadsden, attached).

The Defendant submits that for the reasons contained in his Motion for Summary Judgment and accompanying memorandum, that he is entitled to judgment as a matter of law.

Defendant, by his attorney

Patricia A. Coyne-Fague, #5198
RI Dept. of Corrections
40 Howard Avenue
Cranston, RI 02920
(401) 462-0145/(401) 462-2583 *fax*

**Certification**

I hereby certify that a true copy of the within document was mailed, postage-pre-paid to Plaintiff Wesley Spratt, Maximum Security, P.O. Box 8273, Cranston, RI 02920 on this 31st day of October 2005.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **Wesley Spratt** | : | |
| | : | |
| **vs.** | : | **C.A. No.: 04-112S** |
| | : | |
| **Department of Corrections;** | : | |
| **A.T. Wall** | : | |

**AFFIDAVIT OF JAKE GADSDEN**

1. My name is Jake Gadsden. I am the Assistant Director for Institutions and Operations for the Rhode Island Department of Corrections (RIDOC). I have served in this capacity since September, 2001. Prior to my appointment I served as the Warden of the Medium security facilities at the RIDOC. Prior to my appointment as Warden I served the Massachusetts Department of Corrections as the Warden of the Massachusetts Boot Camp. I have also served the Massachusetts Department of Corrections as Warden of the Northeast Correctional Center; Deputy Warden of Southeastern Correctional Center; Director of Treatment at MCI Norfolk; Supervisor of Social Services at MCI-Cedar Junction at Walpole; and a correctional counselor.

2. As the Assistant Director for Institutions and Operations, my job duties include the supervision of all correctional staff, from correctional officers to Deputy Wardens and Wardens; oversight of all of the facilities (to include security, maintenance, food services, classification, inmate discipline and all essential areas of inmate life). I also oversee the emergency response teams and the Department's Special Investigations Unit.

3. While inmates at the RIDOC may participate in religious services and may even be ordained by clergy, they may not lead religious services or hold a position of perceived leadership. The reason for this is that by placing an inmate in a position of actual or perceived leadership before an inmate group threatens security, as it provides the perceived inmate leader with influence within the administration If an inmate is a leader, he appears to be sanctioned by the administration and may be perceived to be in a position to garner special favors from the administration. Therefore, he may be in a position to use his position of perceived power to gain favors from other inmates, as well as becoming vulnerable to other inmates' pursuit of special favors. The position of leadership then becomes a desirable goal among other inmates, thus creating a competition that is threatening to inmate climate and security. The Department maintains control by treating all inmates fairly and equitably.

4. There is no less restrictive manner to accommodate inmate Spratt's desire to preach to an inmate congregation, other than an outright ban. An inmate preacher, even one preaching under RIDOC supervision, could convey subversive information to the inmates without staff knowledge (through a code, a signal, or other verbal or non-verbal means). Finally, even an inmate who is truly preaching without subversive motivation is nevertheless in a position of perceived power that is threatening to the security of the institution.

5. Through my contacts with peers nationwide, I am familiar with a situation in the Texas Correctional system that bears out my position on this issue. Texas utilized some inmates as "trustees." Trustees were inmates who had positive adjustment to institutional life, and the administration felt they could be trusted to lead other inmates in the right direction (to appropriately adjust to inmate life). The Texas Department of Corrections has abolished this process, as it was found that the trustees abused their position to garner favors from other inmates, and threatened inmates with reprisal if their favors were not granted. I am unwilling to sanction a process here at RIDOC that could create the same dynamic.

Further your affiant sayeth not.

Jake Gadsden, Jr.

Sworn and subscribed before me this 31st day of October, 2005.

NOTARY PUBLIC
My Commission Expires: 11-04-05