**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **WESLEY SPRATT,** **Plaintiff** vs. **A.T. WALL, et al.,** **Defendants.** | **C.A. No.: 04-112S** |

**PLAINTIFF'S OBJECTION TO REPORT AND RECOMMENDATION ("R&R")**

Now comes the Plaintiff, Wesley Spratt, ("Plaintiff"), and hereby objects to the Report and Recommendation issued by Magistrate Jacob Hagopian on November 21, 2005 in the above-referenced matter. Plaintiff relies on a Memorandum of Law, filed on January 9, 2006, in support of his objection.

Wherefore, Plaintiff respectfully requests that the Court's decision recommending that the State's Motion for Summary Judgment not be adopted, and that summary judgment enter in favor of the Plaintiff. Plaintiff also requests injunctive and other further relief as stated in the Memorandum.

Plaintiff,
By his attorney,

Carly Beauvais Iafrate, #6343
Rhode Island Affiliate,
American Civil Liberties Union

170 Westminster St., Suite 601
Providence, RI 02903
(401) 421-0966
(401) 351-4802 (fax)

**CERTIFICATION**

I hereby certify that a true copy of the within document to Patricia A. Coyne-Fague, Rhode Island Department of Corrections, 40 Howard Avenue, Cranston, RI 02920 on the 11th day of January 2006.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **WESLEY SPRATT,** Plaintiff<br>vs.<br>**A.T. WALL, et al.,** Defendants. | **C.A. No.: 04-112S** |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF OBJECTION TO REPORT AND RECOMMENDATION ("R&R")**

## I. INTRODUCTION.

For about seven years Christian inmate and Plaintiff Wesley Spratt ("Spratt" or "Plaintiff") was permitted by Defendant, Department of Corrections' ("DOC") officials, to preach during religious services conducted at the Adult Correctional Institutions ("ACI"). The services were run by outside clergy. For example, from approximately 1998 to 2003, Reverend Turnipse from the Church of God in Providence conducted his own Christian religious service at the ACI. See Exhibit A (Turnipse Letter); Plaintiff's Answer and Objection (Document #25), p. 3, 8-9 (hereinafter "Objection"). During the service, Reverend Turnipse would ask Spratt to expound on the scriptures as part of the service. Spratt did this without incident until October 2003, when the DOC suddenly barred Plaintiff from continuing to exercise his religious freedom in this manner.[1]

The DOC banned Plaintiff from preaching during the service, despite the fact that he was

[1]Spratt believes that God has called upon him to preach God's word. Complaint ¶ 31. As Spratt has stated, not everyone is called to preach God's word. Complaint ¶ 36, 41, 44.

supervised by outside clergy and there is no documented evidence of any actual security problem. There is also no evidence that ACI officials feared a problem at that time, or discussed a potential security problem before they barred Spratt from participating in the service. Nor is there any evidence that ACI officials considered whether there was a less restrictive manner of alleviating their alleged security concerns before they took away Plaintiff's freedom to answer his religious calling. For over two years, Spratt has not been allowed to preach as part of religious services and has been told that if he does, he will be punished.

Significantly, the Magistrate Judge, in reviewing Plaintiff's claim under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq., found that the Plaintiff had met his burden in establishing that (1) his preaching was a religious exercise under the RLUIPA; and (2) that his preaching was substantially burdened by the DOC when it stopped him from doing it. Nonetheless, the Magistrate Judge accorded a degree of deference to the DOC unwarranted by the RLUIPA and found that the DOC established that it had a compelling interest in placing this restriction upon Spratt and that there was no other "less restrictive means" of satisfying its alleged "security" concerns. It is because of these errors that Plaintiff objects to the Report & Recommendation ("R&R") dated November 21, 2005, and hereby advances the following argument in support of his objection.[2]

---

[2]The undersigned is representing the Plaintiff, and has filed this Memorandum, solely for the purpose of challenging the Magistrate Judge's R&R on Plaintiff's RLUIPA claim. In addition, although Plaintiff may disagree with the Magistrate's definition of "substantial burden" under RLUIPA, since he correctly found that Plaintiff had demonstrated that a "substantial burden" exists, there is no need to detail that disagreement here. Plaintiff reserves the right to respond to any specific objections lodged by the DOC to the R&R.

## II. ARGUMENT

*A. The RLUIPA.*

The RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation of their religion." Cutter v. Wilkinson, 125 S.Ct. 2113, 2115, 161 L.Ed. 1020 (2005). Pursuant to the RLUIPA, "'No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution,' unless the burden furthers 'a compelling governmental interest,' and does so by 'the least restrictive means.'" Cutter, 125 S.Ct. at 2116 (quoting 42 U.S.C. § 2000cc-1(a)(1)-(2) (emphasis supplied).

According to the United States Supreme Court, "RLUIPA is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens * * *." Id. at 2117 (emphasis supplied). In Employment Division, Department of Human Resources of Ore. v. Smith, 494 U.S. 872, 878-882, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the United States Supreme Court held that the state could deny unemployment benefits to persons fired from their jobs because of the use of religiously inspired peyote. Following that decision, Congress enacted the precursor to the RLUIPA, the Religious Freedom Restoration Act of 1993 ("RFRA"), codified at 42 U.S.C. § 2000bb et seq. See id. at 2117-18. The RFRA is similar to the RLUIPA because it prohibited States from substantially burdening a person's exercise of religion unless the government could show that the burden furthered a compelling governmental interest and that its burden was the least restrictive means of furthering the compelling interest. See id. at 2118 (citing City of Boerne v. Flores, 521 U.S. 507, 515-516, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). This new and heightened standard meant that the "old" Turner standard no longer applied. Under Turner

v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), when prison officials faced complaints by prisoners for violating their religious freedom they needed only demonstrate the restriction was based on a "legitimate penological interest." After the RFRA (and now the RLUIPA) was enacted, that lighter Turner standard was cast aside by Congress for RLUIPA cases.

Senators Hatch and Kennedy explained the need for the RLUIPA as it pertains to institutionalized persons in a July 2000 joint statement. See 146 Cong. Rec. S774, S775 (July 27, 2000).

> "Far more than any other Americans, persons residing in institutions are subject to the authority of one or a few local officials. Institutional residents' right to practice their faith is at the mercy of those running the institution, and their experience is very mixed. It is well known that prisoners often file frivolous claims; it is less well known that prison officials sometimes impose frivolous or arbitrary rules. Whether from indifference, ignorance, bigotry, or lack of resources, some institutions restrict religious liberty in egregious and unnecessary ways." See id. at S774 (emphasis supplied).

In Cutter, the Court drew on the joint report and noted that "Lawmakers anticipated, however, that courts entertaining complaints under RLUIPA would accord 'due deference to the experience and expertise of prison and jail administrators.'" Id. at 2119 (citing 146 Cong. Rec. S775). Significantly, however, the very next provision in the report provides that "[a]t the same time, however, inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements." 146 Cong. Rec. at S775 (quoting Senate Report 103-111 at 10 (1993) (emphasis supplied).

***B. The Magistrate Judge Erroneously Found that the State Had Met its Burden of Showing that a Compelling Governmental Interest Existed.***

The first problem with the Court's "compelling interest" analysis is that it found it undisputed

that the DOC relied on security concerns to ban Spratt from preaching in October 2003. R&R, p. 8. While there is no dispute that security is the rationale offered by the DOC as part of this litigation, there was nothing said to Spratt in 2003 or included in the DOC's memorandum to him on the issue,[3] stating that the Department was relying on security as the reason to stop him from preaching. See Exhibit B (Dec. 1, 2003 Weeden Memo). As stated in Plaintiff's complaint, after seven years of being both open[4] and undisturbed in his preaching, a correctional officer came into the chapel and told Spratt that he could not sit on a bench. He later said Spratt could not use a particular table.[5] Spratt was later told not to stand on the platform and finally, he was told not to preach at all. Plaintiff's Complaint ¶ 42, 45; see also Exhibit C (Letter to A.T. Wall).

The DOC cannot argue and did not say as part of its summary judgment papers (including Assistant Director Gadsen's affidavit) that in 2003 it detailed then-existing security risks or had then a feared security risk when it banned Spratt from preaching. There is no dispute that there is no actual security problem that existed at any time that relates to the religious services.[6] In addition, even when the State offered the bald assertion that security was the reason for the restriction as part of this litigation Spratt has disputed that security is, in fact, the State's true reason for the ban. See,

---

[3]Warden James Weeden who notified Spratt of the DOC's decision to enforce the ban imposed by the correctional officer did not recite any of the security concerns set forth by Assistant Director Gadsen in his affidavit submitted in support of summary judgment.

[4]As noted by Spratt, his preaching was well-known to the ACI, done in front of the cameras, and told to the Parole Board. This is not disputed.

[5]Spratt was not preaching when he was sitting on the bench, using the table, or standing on the platform. The pulpit is on the floor. Spratt has also preached in the dining room where there does not appear to be a platform.

[6]As Spratt contends in his Objection, pp. 10-11, the maximum security prison where he resides has criminals residing there. If anyone is a threat to the security or suspected of any gang activity they are sent to High Security. There is no explanation why this measure is an insufficient least restrictive means. If ACI officials ever actually find or suspect that Spratt has actually done something that threatens security or participated in gang activity they can take corrective measures at that time just like they do with any inmate.

e.g., Complaint ¶ 19, 42, 44, Objection, pp.8-9 (suggesting the true reason was racism, religious discrimination, or no reason at all).

The Court also erred by stating that it was undisputed that "the prison's authority is compromised when inmates are given positions of authority, such as an inmate who is allowed to preach." R&R, p. 8. Spratt has in fact disputed that preaching as part of a service led by an outside-clergy member gives that inmate a position of authority or leadership. See, e.g., Objection, p. 3 ("To say that plaintiff led their service is an insult to the clergy who used plaintiff as a vessel to expound the scriptures at their services."); see also discussion infra.[7] Even if it is undisputed that the State has based its ban on preaching on security concerns, the Court erred by finding that the State had met its burden in showing a compelling governmental interest exists.

In general, maintaining institutional security is a compelling state interest. However, under the RLUIPA, prison officials have the burden to show that there is a compelling interest in maintaining security created by Spratt's preaching. To interpret the "compelling interest" prong as broadly as the Court has does not comport with the burden set forth under the RLUIPA. See, e.g., Murphy v. Mo. Dep't of Corrections, 372 F.3d 979 (8th Cir. 2004). As stated by the Murphy Court, "[t]he threat of racial violence is of course a valid security concern, but to satisfy RLUIPA's higher standard of review, prison authorities must provide some basis for their concern that racial violence **will result** from any accommodation of [the prisoner's] request." Id., p. 14.

Here, as the following discussion makes clear, the DOC has done nothing but make

[7]Here, it appears that the Magistrate impermissibly accepted the Defendant's version of the facts. The DOC has asserted that Defendant is "leading" the religious service and that he is "unsupervised." DOC Memo Re: Least Restrictive Means (Doc #51), p. 1-2. However, Spratt contends that he is not "leading" the service and that he was not unsupervised. See, e.g., Objection, p.3, 9. Even though the Magistrate recognized that Spratt was supervised he still accepted the DOC's assertion that he was "leading." R&R pp.2 ("Spratt began to preach at and lead").

conclusory assertions which were then adopted wholesale by the Court.

### *C. The Magistrate Judge Erroneously Found that the State Had Met its Burden of Showing that No Less Restrictive Means is Available.*

The Court did not follow the law in deciding that the restriction on Spratt's preaching is warranted in this case. Although Magistrate Hagopian correctly noted that "[r]equiring a State to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is **the most demanding test known to constitutional law**," he did not apply this standard. The Court did not discuss any of the cases relied upon by the Plaintiff. Instead, it incorrectly accepted the DOC's bald assertions in support of its claim that allowing Plaintiff to preach as part of a religious service is a security risk that cannot be accommodated in a less restrictive way than a total ban. This "rush to judgment" is evident by the less-than-two-page discussion in which he takes Assistant Director Gadsen's word as 'gospel,' noting that the restriction is the least restrictive means because "[t]he defendant has legitimately and reasonably concluded that" it is so. R&R, p. 10. The Magistrate accepted the DOC's assertions in toto and "defer[red] to the prison official's judgment." R&R, p. 9. This is not an analysis in accordance with the most demanding test known to constitutional law, but instead, it is clearly more akin to an analysis under the much less demanding Turner standard.

The Court relied on a single case for the basis upon which to defer so strongly to ACI official's judgment. Murphy v. Mo. Dep't of Corrections, 372 F.3d 979 (8th Cir. 2004). Even though Murphy did indicate that even in RLUIPA cases "deference" should be given to "the expertise of prison officials," neither that Court, nor Congress, intended for that deference to be unchecked. Slip Op., p. 11; see also 146 Cong. Rec. at S775 (quoting Senate Report 103-111 at 10

(1993) ("inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or **post-hoc** rationalizations will not suffice to meet the act's requirements").

Specifically, the Murphy Court stated that "[a]lthough we give prison officials 'wide latitude within which to make appropriate limitations,' they 'must do more than offer conclusory statements and post hoc rationalizations for their conduct.'" Murphy, p. 14 (citing Hamilton v. Schriro, 74 F.3d 1545, 1554 (8th Cir. 1996)). Although, "[t]he threat of racial violence is of course a valid security concern,[] to satisfy RLUIPA's higher standard of review, prison authorities must provide some basis for their concern that racial violence will result from any accommodation of [the prisoner's] request." Id., p. 14. Accordingly, the Murphy Court rejected the prison's conclusory allegations regarding the unavailability of less restrictive means. Id., p. 15.

The Court here ignored the fact that the DOC must meet its burden of demonstrating that a complete ban on Spratt's preaching was the least restrictive means of meeting its supposed security concerns. See 42 U.S.C. § 2000cc-1; 2000cc-5(2) ("the term 'demonstrates' means meets the burdens of going forward with the evidence and the persuasion"). "A governmental body that imposes a 'substantial burden' on a religious practice must demonstrate, and **not just assert**, that the rule at issue is the least restrictive means of achieving a compelling governmental interest." O'Bryan v. Bureau of Prisons, 349 F.3d 399, 401 (7th Cir. 2003). Even the DOC admits that "if some level of compromise can be effectuated between the inmate's religious request, and the prison's security concerns, then a 'least restrictive manner' exists." DOC Memo re: Least Restrictive Means, Document #51, p. 1 (hereinafter "Memo"). However, there is no evidence that the DOC actually "considered and rejected the efficacy of less restrictive measures before adopting the challenged

practice."[8] Warsoldier v. Woodford, 418 F.3d 989, 999 (9th Cir. 2005) (prison officials cannot meet their burden to prove less restrictive means without demonstrating it actually considered any). "Where a prisoner challenges the [prison's] justifications, prison officials must set forth detailed evidence, tailored to the situation before the Court that identifies the failings in the alternatives advanced by the prisoner." Warsoldier, 418 F.3d at 1000 (citing May, 109 F.3d at 564-65).

Here, it is clear that supervised preaching that existed in an unremarkable way for seven years is already the least restrictive means. This practice is totally consistent with what is done on the federal level. For example, the Federal Bureau of Prisons which "for more than a decade" "has managed the largest correctional system in the Nation under the same heightened scrutiny standard as RLUIPA without compromising prison security, public safety, or the constitutional rights of prisoners," does not prohibit preaching. Warsoldier, 418 F.3d at 1000; See BOP Policy, 5360.09, http://www.bop.gov /DataSource/execute/dsPolicyLoc. Instead, "inmate-led religious programs require constant staff supervision." Id. § 7(b) (emphasis supplied). BOP allows inmate-led religious programs with staff supervision, which includes BOP chaplains, clergy contractors, or clergy volunteers. See id. In order to meet security and safety concerns, the BOP not only provides for supervision, but restricts those from participating if they have no religious preference indicated and has a list of certain activities that cannot take place (i.e., language or behaviors that could reasonably be construed as a threat to the safety and security of the institution). See id. § 7(c). This

[8]The DOC did not even attempt, at any time since the inception of this litigation, to speak with Spratt about whether there exists a less restrictive means. Like in failure-to-accommodate claims under the ADA, this "interactive process" type of discussion would show that the DOC at least genuinely at that time considered reasonable alternatives prior to taking its rigid position. See, e.g., Morton v. UPS, Inc., 272 F.3d 1249 (9th Cir. 2001) (the jury is entitled to decide if the employer had participated in the interactive process in good faith, there could have been other, unmentioned possible accommodations).

demonstrates that supervision by the outside clergy person which is already in place is the least restrictive means. See Warsoldier, 418 F.3d at 1000 ("[T]he failure of a defendant to explain why another institution with the same compelling interest was able to accommodate the same religious practices may constitute a failure to establish that the defendant was using the least restrictive means.") (citing Cheema v. Thompson, 67 F.3d 883, 885 n. 3 (9th Cir. 1995)).[9]

In fact, it would appear that the DOC does have a policy which it used against Spratt, even though he was, in fact, complying with it. See Ex. B. Warden Weeden recited DOC policy 3 26.01-2, "Religious Programs & Services," which apparently provides that "Inmate services and religious programs are scheduled, supervised and directed by Institutional Chaplains." Here, the service was scheduled, supervised and directed by Reverend Turnipseed. As noted in Reverend Turnipseed's letter, he states that Spratt "has been expounding the scriptures in **my** chapel services for about five years without incident." See Ex. A (emphasis supplied). The DOC has not alleged that Spratt directed, scheduled or supervised his own service.

The overwhelming case law (not addressed by the Court) supports the fact that supervised religious exercise - - what existed in 2003 when Spratt last preached - already constitutes the least restrictive means of furthering the State's compelling governmental interest. See, e.g., Anderson v. Angelone, 123 F.3d 1197, 1198-99 (9th Cir. 1997) (under the even less stringent Turner standard, while inmate could not act as minister of his own church "requiring an outside minister to lead religious activity among inmates undoubtedly contributes to prison security" and Plaintiff "is

---

[9]Similarly, the BOP has an entirely separate policy for inmate organizations which includes provisions for how the "officers" of the organizations must conduct their business. BOP Policy 5381.05. The State cannot possibly say that the BOP has less reason to be concerned about potential "perceived leadership" problems. To the contrary, the BOP has put in place measures (like supervision) to address them in the face of the strict requirements of the RLUIPA.

welcome to assist the prison chaplain in leading religious activities"); Benjamin v. Coughlin, 905 F.2d 571, (2d Cir. 1990) (under Turner standard denying Rastafarians the right to congregate because they had no outside sponsor but Muslim and Buddhist inmates are permitted to use inmate religious leaders under the supervision of an outside sponsor who is not even present at the meeting) (emphasis supplied); Adkins v. Kaspar, 393 F.3d 559, 564-65 (5th Cir. 2004) (under the less-stringent Turner standard, Court noted that Plaintiff was permitted to hold religious services when a religious elder from outside the prison was able to come to the prison).

By comparison, the DOC relied on Morrison v. Cook, 1999 WL 717218, (D.Or., filed Apr. 27, 1999) for its proposition that "inmate-led" religious services should be banned for security reasons. Again, Spratt disputes that this case involves an "inmate-led" religious service. In all events, there was no evidence in Morrisson that an inmate had expounded the scriptures during the service for seven years - - without incident. The Morrison Court cited several other cases in stating that "[t]his type of claim, however, has been rejected by virtually every other court that has considered the questions." See Benjamin v. Coughlin, 905 F.2d 571, 577-78 (2d. Cir), cert denied, 498 U.S. 951 (1990); Cooper v. Tard, 855 F.2d 125 (3d Cir. 1988); Johnson-Bey v. Lane, 863 F.2d 1308 (7th Cir. 1988). Critically, none of these cases were decided under the heightened standard in the RLUIPA - - they were all decided under the much less deferential Turner standard. Further, all involved inmate-led religious services with no supervision. To be sure, the factual and legal circumstances are so disparate in these cases that they cannot guide the Court here. For example, in Cooper, the prison prohibited inmates in its MCU unit, a unit which already held prisoners identified as threats to internal security, from engaging in religious group activity without chaplaincy supervision. The Plaintiff in Cooper refused outside clergy. The Court determined that the prison's

restriction was reasonable. The 23-hour lock-down facility in Cooper is akin to High Security (or worse) at the ACI. The Plaintiff sought unsupervised religious activity. None of those circumstances are present here.[10] Even if the supervised preaching that already existed was not the least restrictive means, there are other accommodations that can be explored. For example, the Court did not explain why DOC security concerns could not be addressed by having an ACI official[11] supervise the service. Specifically, the DOC stated that if the service was supervised by an ACI official their concerns would be "somewhat alleviated" and the only remaining problem would be that he may "use a code or signal to communicate to the inmate population during his 'sermons.'" Memo, p. 2.[12] This type of conclusory statement has absolutely no evidentiary support - - especially since Defendant had no problems in the seven years Spratt preached. This type of assertion is the exact type of "exaggerated fear[], or **post-hoc** rationalization[] [that] will not suffice to meet the act's requirements." See supra. Yet, since the Court did not mention this it appears it adopted the DOC's view wholesale. Spratt is left with no explanation about how the fact that he preached increases the probability that he would communicate some subversive message to other inmates. Communicating subversive messages can happen in any place or context within the prison and

---

[10]For further discussion of these cases, see Objection, pp. 5-8, 11-13. In addition, Plaintiff contends that this type of speculation is not appropriate here, when there is no need to speculate since the practice has already been in place and none of the speculative fears have borne out.

[11]This point assumes only for the purpose of argument that there is a distinction between supervision by an outside, ACI sanctioned clergy person and someone employed by the ACI. In addition, Plaintiff does not concede that ACI officials were not already supervising since he did preach before a camera.

[12]Likewise, Gadsen asserted that if expounding on the scriptures is perceived as a leadership position, then others may compete for the position further threatening inmate climate and security. Again, in the past seven (7) years there has been no such competition which demonstrates that this claim is mere speculation and is not supported by actual events. Further, Plaintiff has stated that there have been other preachers in addition to himself. Complaint ¶ 37. Thus, there appears to be no need for competition since there is no reason why more than one inmate cannot expound upon the scriptures during the service or otherwise assist the outside clergy.

cannot be prevented. If the prison is relying on this as a basis to deprive Spratt of his religious freedom shouldn't it have to at least demonstrate how that concern is addressed among the general population and how it cannot be addressed when someone is preaching?[13] See also Objection, pp. 7-8 ("If any so-called gang members want to talk any gang nonsense, they have the entire day and late rec at night to do so. The prison can't prevent people from talking").

In addition, because the Court adopted the DOC's opinion that no accommodation could be made, no consideration was given to the idea of whether changing Spratt's physical position might alleviate the alleged fear of actual or perceived leadership. For example, why couldn't Spratt expound on the scriptures from a position within the congregation and not behind the pulpit (which is already located on the floor)? How would that be different from what he is doing on a daily basis outside of the formal service? Why should the DOC prevent him from reading his scripture and expounding on it aloud within the congregation versus in the general population? How is the security risk heightened by his expounding as part of the congregation? The DOC has to establish

---

[13]For example, the DOC relies heavily on its allegation that in all events, Spratt's preaching is a leadership position or at a minimum, creates a perceived leadership position. The DOC presented no evidence how this is different from any leader or perceived leader of any inmate group. The DOC would be hard-pressed to say that there are no other "groups" that form among inmates whether it is for social, education, work, or other purposes. Is the DOC saying that there are no groups (such as a gang) with any leader or perceived leader? How do they ensure security in that case. This writer supposes that it is done primarily by supervision and punishment after the fact. In a case such as this, where there is a paramount constitutional right to freely express one's religion, why should Spratt be subjected to any more restrictions than the ordinary inmate? See also Objection, p. 12-13 (discussion by Plaintiff of Imam in the Muslim Community - the Imam is a leader and the prison does not prevent that). Note that ordinary inmates are not prevented from speaking and there is no evidence that gang-related messages are not transpired during regular speech or that they can be done more frequently during a religious service supervised by a legitimate outside clergy person.

The DOC further alleges that the "Trustee" scenario in Texas is a basis to ban Spratt from preaching. There is no evidence that the inmates in Texas were expressing any religious freedom as part of the Trustee program. In addition, it appears that Texas DOC specifically placed these "trustees" directly into a position of leadership and asked them to lead. This situation is completely different and no evidence of motive here. Motive in that case had to be addressed. Addressed after they tried it and they failed.

that somehow it is different or else all inmates would be prohibited from expounding the scriptures throughout the prison. As Spratt put it in his original Complaint "you can play cards, you can play chess," but preaching is banned because "it might be gang-related." Complaint ¶ 8. The Court, like the DOC, did not consider the efficacy of any less restrictive means, but merely accepted the DOC's conclusory statement that there were none.

The Court did not address the Defendant's explanations against the unmistakable Congressional mandate that "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or **post-hoc** rationalizations will not suffice to meet the act's requirements." 146 Cong. Rec. at S775 (quoting Senate Report 103-111 at 10 (1993)). For example, the Court relied upon the DOC's assertion that groups who wielded authority or perceived authority contributed to unrest and violence in the prison during the 1970s. Relying on this fact to justify that no less restrictive means exists makes no sense for several reasons. First, ACI officials must have determined that none of the factors present which led to the 1970s violence existed or were connected in any way to preaching when, over twenty-five years later, they allowed Spratt to begin preaching. Otherwise it would never have happened. Thus, the DOC cannot now rely on a comparison to a situation that must not have been a concern and no circumstance has changed to show that somehow it should now be a concern. Again, the DOC has presented no evidence from 2003 which shows this was a concern.

Here, a sanctioned clergy member is present, supervises, directs, and leads the religious service. In addition, the heightened standard under RLUIPA applies. Accordingly, it is clear that the Magistrate erred by finding that the DOC had met its burden to establish that supervised preaching is not the least restrictive means and that no other less restrictive means exists.

## III. CONCLUSION

It is apparent here that the Court improperly "defer[red] to the prison officials' judgment," and accepted the DOC's unsupported explanations for its sudden and unexplained change of position over the facts which establish that allowing Spratt to continue preaching, as he had for seven years, while supervised, satisfies security concerns and preserves his critical religious exercise. There is simply not a scintilla of evidence that this is not the case. The DOC has simply not satisfied "the most demanding test known to constitutional law." City of Boerne, 521 U.S. at 545.

Based upon the foregoing, Plaintiff respectfully requests that this Court vacate summary judgement in favor of the DOC, and instead, enter summary judgment in Plaintiff's favor. In addition, Plaintiff requests that the DOC be ordered to permit Spratt to expound upon the scriptures as part of the Christian religious services, as he had been doing from approximately 1996-2003, and order any other relief the Court deems appropriate.

Plaintiff,
By his attorney,

Carly Beauvais Iafrate, #6343
Rhode Island Affiliate,
American Civil Liberties Union
170 Westminster St., Suite 601
Providence, RI 02903
(401) 421-0966
(401) 351-4802 (fax)

**CERTIFICATION**

I hereby certify that a true copy of the within document to Patricia A. Coyne-Fague, Rhode Island Department of Corrections, 40 Howard Avenue, Cranston, RI 02920 on the 9th day of January 2006.

# EXHIBIT A

13 Kepler Street
Providence, RI 02908
November 3, 2003

RE: Wesley Spratt

Dear Sir or Madam:

Wesley Spratt has been expounding the scriptures in my chapel services for about five years without any negative incidents.

Because of his congenial personality and leadership qualities, he has been an excellent role model. He is well-respected by his peers and is able to elicit support and cooperation in spreading the gospel of love, peace, and unity.

He has proven that he is a reliable person who understands the importance of trust and responsibilities. Observing his growth and development over the years has convinced me that he won't look back. His present makes sense now that he has purpose.

Sincerely yours,

James E. Turnipseed

James E. Turnipseed
Supportive Services Chaplain

# EXHIBIT B

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
## INTER-DEPARTMENTAL MEMO
## MAXIMUM / HIGH SECURITY

Memorandum to: Wesley Spratt

Identification #: 73735

From: James Weeden, Warden

Department: Maximum/High Security

Date: December 1, 2003

Subject: **Preaching at Religious Services**

In response to your letter concerning our conversation in the dinning room and my decision to bar you from preaching at religious services held here at Maximum Security, I must correct your statement that I said " If you preach your gonna (sic) be booked then you can take that to court."

That is not what I said. My statement was " That you would be booked if you preach here at Maximum Security." You then said it was your right to freedom of speech to preach at services. I disagreed and said if you wanted the order in writing write me a request and I would answer. You then said you would take it to court, which I responded that it was within your rights as long as you follow the rules and proceed accordingly.

As stated in Policy 3 26.01-2DOC "Religious Programs and Services" Inmate services and religious programs are scheduled, supervised and directed by Institutional Chaplains. I am again reminding you that if you are observed preaching at services you will face disciplinary action.

Cc: File

# EXHIBIT C

To: Mr. Ashbel T. Wall, Director
Office of the Director
Rhode Island Department of Corrections
40 Howard Avenue
Cranston, Rhode Island 02920

Fr: Mr. Wesley Spratt
A1-18 Maximum Security
Post Office Box 8273
Cranston, Rhode Island 02920

Re: Religion / Rehabilitation

November 8, 2003

Dear Director Wall:

My name is Wesley Spratt, and I am housed in maximum security. By God's grace, I have had the privilege and opportunity of ministering to the christian community here at the Adult Correctional Institutions maximum security under the tutelage and guidance of the ministry coming into maximum security for the past seven (7) years. Two (2) years under the supervision of Sister Maryann Langvin. The last five (5) years have been under the supervision of Rev. Turnipse of Church of God, Beacon Avenue Providence.

Several years ago I was interviewed by the Rev. Vincent Thompson, the husband of the Rev. Janise Thompson, who is now a Chaplin at Medium Security. Some weeks later I was tape recorded, it was the intention of Mr. & Mrs. Thompson to ordain me here at the Adult Correctional Institutions, however, Mrs. Thompson went to the Medium

Security facility to cover for Rev. John Miller, who went on a Sabatecal and surprizely passed on to be with the Lord. The Department of Corrections elected Rev. Thompson to the position vacated by Rev. Miller.

Here at maximum security I have continued to preach God's word under the tutelage and supervision of Rev. Turnipse, spliting the Friday night service and receiving pointers from Rev. Turnipse. I have preached on camera in the dining room for years. At every Classification Board hearing I have stated on the recorded record that I preach in the Chapel on Friday nights. Lt. Alves, and Lt. Chappell, as well as Captain Ashton, all are fully aware that I do this, every Deputy Warden, as well as Warden Whitman all know that I am a christian and that I share in delivering the Friday night service. I have reached out to just about every inmate in this security except a few of the new one's who I've yet to meet.

I am writing you because on October 16, 2003 I was told I could no longer preach in the christian service. A Correctional Officer whom they say is a racist, which doesn't make any difference to me personally because of my faith. It started with this officer and it was he that ordered me not to preach at the services and the Warden backs the officer's play.

I showed Warden Weeden where it's a violation of my constitutional rights and that Correctional Officer Maycomer, who's been here over a year and witnessed me preaching during that time period chose to exercise his authority and order me not to preach under the tutelage and supervision of Rev. Turnipse. When I brought this problem to Warden Weeden, he without any explanation said I can't preach at

the services.

Mr. Wall, this is something that can't be hidden behind the convience of a security risk. This is just plain evil and meanness. Correctional Officer Maycomer would never have gotten away with this while Warden Whitman, or Deputy Warden Hiltermann was here. If I were doing anything wrong Captain Ashton, or one of the numerous Lieutenant's would have spoken to me about it over the last five (5) years.

It is my hope that by writing you for help that you will intervene and instruct them to allow me and any other individual who is striving to change and better themselves under the tutelage, instruction, and supervision of the clergy to answer God's calling under the direct supervision of the ministers who come here. This is not a disruptive but orderly service.

After showing Warden Weeden a copy of the First Amendment I decided that I write you and Mr. Jake Gadsden, Assistant Director of Operations. Mr Weeden suggested that I write him asking if I could preach and he will answer stating that if I preach I will be booked and that I could take that to court.

For the past six years I went without a T.V. devoting myself to the study of the Word of God, my room / cell has nothing but study material and legal work. I pray you will intervene and aid me in this matter, thank you. I pray God for help and I humbly await your answer.

Respectfully,

Wesley Spratt

Wesley Spratt

SAC / Jake Gadsden, Asst. Dir. Operations
Justice Ernest Torres, Federal Court