**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **Wesley Spratt** | : | |
| | : | |
| **vs.** | : | **C.A. No.: 04-112S** |
| | : | |
| **Department of Corrections;** | : | |
| **A.T. Wall** | : | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S RESPONSE TO PLAINTIFF'S OBJECTION TO THE MAGISTRATE'S REPORT AND RECOMMENDATION**

Now comes Defendant A.T. Wall (Director of the Rhode Island Department of Corrections) and hereby responds to the Plaintiff's Objection to the Magistrate's Report and Recommendation. For the reasons argued below, the Defendant respectfully requests that this Court adopt and affirm the Magistrate Judge's Report and Recommendation.

**I. Introduction/chronology**

Inmate Wesley Spratt is incarcerated at the Adult Correctional Institutions (ACI) of the Rhode Island Department of Corrections, serving a life sentence with a consecutive forty year prison term for murder and related offenses. Spratt is currently, and was at all times pertinent to this litigation, housed within the Maximum Security facility of the ACI. Beginning approximately five to seven years ago, Spratt began preaching to an inmate congregation, during Christian services at the Maximum Security facility. The Warden of the Maximum Security facility during that period did not stop Spratt's preaching. In October 2003, the Wardens of the various prison facilities at the ACI were reassigned, and a different Warden became the Warden of the Maximum Security facility. Shortly after taking the helm, this Warden became aware of inmate Spratt's preaching. As soon as he became aware of it, the Warden ordered that no inmate would

be permitted to preach to an inmate congregation. The Warden's position was that while any inmate could perform scripture readings or recite prayers, to permit a prison inmate to expound upon the scriptures before a congregation of other prison inmates represented a threat to institutional security as it created a perception that the inmate has a position of stature over other inmates. The Warden's reasoning and his ability to halt Spratt's preaching is supported by Department of Corrections Policy # 26.01-2, Religious Programs and Services, which provides that it is the responsibility of clergy to lead religious services, and also grants to the Warden the authority to limit, postpone or even cancel religious programs or inmates' participation in religious programs if he finds that there is posed a threat to the security, safety or well-being of the institution, its visitors, inmates or staff.

Displeased with being relegated to a mere participant in religious services, Spratt filed suit pursuant to Section 1983 (those claims were later dismissed upon Defendant's motion) and pursuant to the Religious Land Use of Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1. Both Spratt and Director Wall filed for summary judgment. Senior U.S. Magistrate Judge Jacob Hagopian issued a Report and Recommendation on November 21, 2005, recommending summary judgment in the Defendant's favor. Spratt has appealed, pursuant to Fed.R.Civ.P. 72(b); Local Rule 32. For the reasons argued herein, the Defendant respectfully requests that this Court adopt and affirm the Magistrate Judge's Recommendation and grant summary judgment to the Defendant.

**II. Standards of Review**

**A. Standard when the Court reviews the Magistrate Judge's Report and Recommendation.**

Rule 8(b)(4) of the Rules Governing Proceedings in the United States District Courts requires that this Court make a de novo determination of the Defendant's Motion for Summary Judgment. This Court may accept, reject, or modify in whole or in part any findings or recommendations made by the Magistrate Judge. Therefore, this Court must determine for itself whether there are any genuine issues of material fact, and whether the Defendant is entitled to judgment as a matter of law.

**B. Standard for the Issuance of Summary Judgment**

Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corporation v. Catrett,* 477 U.S. 317, 322 (1986). The moving party is entitled to a judgment as a matter of law when the nonmoving party has failed to make a sufficient showing on an essential element of their case with respect to which they have the burden of proof. *Id.,* at 323, *other citations omitted.* "Material facts" are defined as "those that might affect the outcome of the suit under the governing law." *Aurelio v. RI Department of Administration, DMV,* 985 F.Supp. 48 (1997), *citing Morrissey v. Boston Five Cents Sav. Bank* 54 F.3d 27, 31 (1st CIR. 1995), *other citations omitted.* The role of summary judgment is to "pierce the

pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug*, Inc., 895 F.2d 46, 50 (1st Cir. 1990).[1]

**III. The Religious Land Use of Institutionalized Persons Act**

**A. Burdens under RLUIPA**

The Religious Land Use of Institutionalized Persons Act (RLUIPA) 42 U.S.C. § 2000cc-1, provides for a four-step process for reviewing claims for religious accommodation filed by prison inmates. The inmate bears the initial burden of showing that the prohibited activity is a religious exercise. Next the inmate must demonstrate that the prison administration is "substantially burdening" that exercise. If the inmate meets his burden of demonstrating those two factors, the burden then shifts to the prison administration to demonstrate that they have prohibited the activity in furtherance of a compelling interest, and that they have done so by the least restrictive means possible.

In his Report and Recommendation, Magistrate Judge Hagopian found that inmate Spratt had met his burden of showing that his desire to preach is a religious exercise. He further found that inmate Spratt's religious exercise was substantially burdened by the Department of Corrections' prohibition of his preaching. The Magistrate then found that the maintenance of prison security is clearly a compelling interest and that the interest was being met in the least restrictive manner possible.

**B. Defendant has met his Burden of Showing that the Prohibition on Spratt's Preaching Furthers a Compelling Interest in the Least Restrictive Manner**

In his memorandum in support of his objection to the Report and Recommendation, inmate Spratt avers that the Magistrate Judge erred in finding that

[1] Pursuant to Local Rule 12.1(a)(1) Defendants filed a statement of undisputed facts contemporaneously with their motion for summary judgment in July 2004.

there was a compelling interest in prison security, arguing that the Defendant had to prove that there is a compelling interest in prison security that is particularly threatened by Spratt's preaching. Defendant submits that he has done so, as recognized by the Magistrate Judge in the Report and Recommendation: "It is ***plainly evident*** here that allowing the plaintiff to be in a position of authority, or perceived authority, creates a security concern." (*Spratt v. Wall*, 2005 U.S. Dist. LEXIS 33266, 14-15 (Nov. 21, 2005) [Emphasis added]). Magistrate Judge Hagopian quoted from the U.S. Supreme Court's most recent case involving RLUIPA:

> RLUIPA does not 'elevate accommodation of religious observances over an institution's need to maintain order and safety.' A correctional institution's 'security ***is a compelling interest and deference is due to institutional officials' expertise'*** *Id.* at 14-15, quoting from *Cutter v. Wilkinson*, 125 S.Ct. 2113 (2005).

The Defendant has met his burden under RLUIPA that the restriction placed on Spratt's preaching is the "least restrictive means" of furthering the compelling interest in prison security. There is simply is no way of accommodating Spratt's desire to expound on scripture in his own words ("preach") before an inmate congregation without there being created a perception that he holds a position of authority or influence. Spratt suggests that permitting him to preach while being supervised by clergy members is the least restrictive method, however, as Defendant argues below, even the *perception* created by Spratt preaching, particularly if supervised by a clergy person, as that will portray the apparent approval and sanction of the clergy officiant, is dangerous to institutional security. Defendant directs the Court's attention to the letter from Chaplain James Turnipseed, appended by Spratt to his original Complaint, wherein Turnipseed describes Spratt as a leader and a "role model" to other inmates. Clearly then, even under

the supervision of clergy, Spratt's preaching position sets him apart from other inmates, placing him in a special position of trust and authority.

Beyond Defendant's argument that an inmate preacher could use the pulpit as a platform for communicating nefarious information to a large group of inmates, which Defendant maintains as part of his compelling interest argument, even if Spratt's motivation for wanting to preach are as pure as snow, other inmates could rightfully perceive Spratt to hold an elevated or favored position over other mere congregants. Such a perception even poses a risk to Spratt himself, as other inmates who view him as having a special position of influence or authority may attempt to extort favors from him. Such a scenario is a legitimate concern about something that could actually happen, in the experience of the Warden, the Assistant Director and the Director, who have a combined total of fifty-one years' experience in prison administration. Such an imbalance among inmates is inarguably dangerous to the orderly, safe, and secure operation of a Maximum-security prison facility.

In *Morrison v. Cook*, 1999 WL 717218 (D.Or.) the U.S. District Court for the District of Oregon addressed a claim by a prison inmate who wished to lead religious services within the prison:

> Plaintiff appears to be challenging the constitutionality of a rule banning inmate-led religious activities in Oregon prisons. **This type of claim, however, has been rejected by virtually every court that has considered the question.** *See, e.g., Benjamin v. Coughlin*, 905 F.2d 571, 577-578 (2nd Cir.), *cert. denied*, 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990); *Cooper v. Tard*, 855 F.2d 125, 129 (3rd Cir. 1988); *Johnson-Bey v. Lane*, 863 F.2d 1308 (7th Cir.1988) (a prison "need not yield to their desire to invite convicted felons, frocked or unfrocked, to conduct religious services in the prison"). *Morrison* at 10. [Emphasis added].

The Seventh Circuit Court recognized that "[a]llowing prisoners to lead religious services also gives them a greater position of authority over other inmates than do many other leadership positions." *Hadi v. Horn*, 830 F.2d 779, 785 (7th Cir. 1987). See also, *Anderson v. Angelone et al.*, 123 F.3d 1197, 1198 (9th Cir. 1997) ("Requiring an outside minister to lead religious activity among inmates undoubtedly contributes to prison security.")

**IV. The prison must act preemptively to prevent security breaches**

Spratt argues that because no disruptive or dangerous events occurred during the time he was not prevented from preaching, then the Department of Corrections should not be permitted to prevent him from preaching now. However, prison administrators should not be bound by mistakes made by predecessors when they can be remedied in order to ensure institutional security. Following Spratt's logic, had the new Warden found an open gate in the Maximum-Security prison, he would not be justified in closing and locking the gate if no one had yet escaped through the open gate. Obviously such a scenario would be a gross dereliction of duty on the Warden's part, as his job is to ensure the safety and security of the facility, staff, and inmates, regardless of whether anything "bad" had happened yet. Defendant Wall submits that the prior Warden's failure to "close and lock the gate" on Spratt's preaching should not bind a subsequent administrator from remedying a security breach. Indeed, it has been recognized, appropriately, that prison administrators may act preemptively to prevent breaches of security, see *Casey v. Lewis*, 4 F.3d 1516, 1521 (9th Cir. 1993), as noted by the Magistrate Judge in the Report and Recommendation (footnote 4, at page 14). See also *Thornburgh*

v. Abbot, 490 U.S. 401, 417 (1989) and Friedman v. Arizona, 912 F.2d 328. 332-33, (9th Cir.1990) *cert denied* 498 U.S. 1100 (1991).

Spratt argues in his objection that the prison should have to prove exactly what security breaches will result from permitting him to preach to an inmate congregation, citing Murphy v. Missouri Department of Corrections, 372 F.3d 979 (8th Cir., 2004) as support. However, besides the fact that an Eighth Circuit case is not controlling in this jurisdiction, Murphy is factually distinctive from the case at bar, in that the Missouri Department of Corrections imposed an outright ban on congregational worship for the religion to which Murphy belonged, whereas Spratt is free to attend and participate in congregational worship at the ACI. Further, the Court in Murphy found that the Missouri Department of Corrections did not have to prove that a riot would actually occur if group worship were allowed, but rather did not meet their burden of showing that the outright ban was the "least restrictive means" of protecting their valid security concerns. Wall submits therefore that it is not necessary, as Spratt argues, that he prognosticate the exact events that would occur in the future should Spratt be permitted to preach, but that he demonstrate that the ban on Spratt's preaching is the least restrictive means of furthering the compelling interest in prison security. To hold otherwise would result in a ludicrous scenario where the prison administration could not seek to prevent violence, unrest or escape simply because they do not possess clairvoyant powers.

Defendant Wall further argues that the Rhode Island General Assembly has imposed upon his office the responsibility and authority to maintain and ensure the safety

of the ACI, as stated below:

> Rhode Island General Laws § 42-56-10 **Powers of the director.** – In addition to exercising the powers and performing the duties which are otherwise given to him or her by law, the director of the department of corrections shall:
>
> * * *
>
> (2) Maintain security, safety, and order at all state correctional facilities, utilize the resources of the department to prevent escapes from any state correctional facility, ***take all necessary precautions to prevent the occurrence or spread of any disorder, riot, or insurrection of any state correctional facility***, including but not limited to the development, planning, and coordination of emergency riot procedures, and take suitable measures for the restoration of order; [Emphasis added].

Nowhere in the statute giving the Director these responsibilities is there a requirement that he wait until unrest happens, or danger explicitly occurs before he must act to ensure the safety of the facility.

The U.S. Supreme Court has held that "[p]rison administrators * * * should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security" *Bell v. Wolfish*, 441 U.S. 520, 547 (1979), *other citations omitted.* The Court in *Wolfish* went on to state that "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial," *Id.*, at 548. The Court recognized that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters. *Id.* Magistrate Judge Hagopian properly deferred to the Department of Corrections' administrators' expertise in this matter, "[m]indful of the

defendant's ***primary*** obligation and responsibility to preserve good order and maintain discipline, custody and control of those who have been legally convicted of criminal offenses," (R&R at 17 [Emphasis added]). Defendant Wall respectfully submits that this Court should adopt that same deference.

## V. Other Prison systems recognize the security interest in barring inmates from leading religious services

Within his memorandum in support of his objection to the Report and Recommendation, Spratt argues that the Bureau of Prisons permits inmate led services of the type in which Spratt wishes to engage. However, it is important to note that the Bureau of Prisons, like other state-run prison systems, permits inmate led religious services under staff supervision only in instances where a clergy leader from outside the prison cannot be located to lead the service. This is done because the alternative would be to deny inmates the religious service outright, precisely the sort of bar for which Missouri's Department of Corrections was chastised by the court in the *Murphy* case. In the case at bar, Spratt has full access to participate and attend a Christian service as facilitated by a clergyman retained by the Department of Corrections. Were Spratt in a federal prison, or in one of many other state systems (e.g., Massachusetts, Connecticut, Kansas, Washington, Oregon, et al.)[2] he would not be permitted to preach to an inmate congregation where the prison had secured a clergyperson to lead the service.

## VI. Conclusion

Even as it recently upheld the constitutionality of RLUIPA, insofar as the Establishment Clause is concerned, the United States Supreme Court reiterated that

[2] See attached e-mails from prison officials in those states, as well as the Bureau of Prisons, responding to counsel's inquiry re: their policies.

"[i]t bears repetition, however, that ***prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area***" Cutter, other citations omitted [Emphasis added]. The Department of Corrections has remedied a security breach that, thankfully, had not yet resulted in disorder or injury, but could well have. The bar on inmate preaching mirror the policy and practice of many other state corrections' departments, as well as the federal system. Inmate Spratt is free to worship and pray during services, but to permit him to preach in his own words presents an unacceptable security risk. For the reasons argued in this memorandum, the Defendant respectfully requests this Court adopt and affirm the Report and Recommendation of the Magistrate Judge that granted summary judgment to Defendant.

Defendant Wall, by his attorney,

Patricia A. Coyne-Fague #5198
RI Department of Corrections
40 Howard Avenue
Cranston, RI 02920
(401) 462-0145
(401) 462-2583 *fax*

**Certification**

I hereby certify that a true copy of the within document was mailed, postage pre-paid, to Carly Beauvais Iafrate, Rhode Island Affiliate, ACLU, 170 Westminster Street, Suite 601, Providence, RI 02903 on this 24th day of February 2006.

**Coyne-Fague, Patricia**

**From:** Alexandre, Henri [Henri.Alexandre@po.state.ct.us]
**Sent:** Friday, January 13, 2006 8:01 AM
**To:** Chief Legal Counsel
**Subject:** [clc] RE: RLUIPA

Connecticut does not permit inmates to lead religious services. It is strictly prohibited by our Administrative Directive.

-----Original Message-----
From: patricia.coyne-fague@doc.ri.gov [mailto:patricia.coyne-fague@doc.ri.gov]
Sent: Wednesday, January 11, 2006 3:18 PM
To: Chief Legal Counsel
Subject: [clc] RLUIPA

Hello all.
We have a maximum-security inmate who was permitted under a previous administrator to "preach" during religious services, to an inmate congregation. A new administrator barred the inmate from preaching, and he sued us under the Religious Land Use of Institutionalized Persons Act (RLUIPA). Our motion for summary judgment was recommended to be granted by the Federal Magistrate, and is now pending before the Federal Judge. The ACLU has entered on the inmate's behalf. The ACLU argues that if the inmate is supervised, then he should be allowed to preach; and that since nothing bad has happened up to now, we can't stop him from preaching.

My argument is essentially that there is no "least restrictive means" to accommodate the inmate's desire to preach, as permitting him to preach places him in a position of authority, or perceived authority among inmates, which is threatening to security. The fact that nothing bad happened during the 7 years he was permitted to preach does not preclude us from acting preemptively to prevent something bad from happening now.

Have any of you dealt with inmates who want to lead or preach during religious services?

Do any of your Departments have written policy that permit or prohibit such preaching?

Thank you for any help you can lend

Patricia A. Coyne-Fague
Chief Legal Counsel
RI Department of Corrections
40 Howard Avenue
Cranston, RI 02920
(401) 462-0145
(401) 462-2583
patricia.coyne-fague@doc.ri.gov

---

**Coyne-Fague, Patricia**

**From:** Nancy White [Nancy.White@state.ma.us]
**Sent:** Friday, January 13, 2006 9:39 AM
**To:** Coyne-Fague, Patricia; clc@www.nicic.org
**Subject:** Re: [clc] RLUIPA

Massachusetts DOC does not permit inmates to lead other inmates in worship services. 103 DOC 400, INMATE MANAGEMENT, subsection 400.06, subtitled "No Inmates May Control Over Other Inmate(s)", states: "No inmate or group of inmates shall be in a position of control or authority over any other incarcerated person(s)."

Nancy White, General Counsel
MA Dept. of Correction
(617) 727-3300 ext.112
nancy.white@state.ma.us

>>> patricia.coyne-fague@doc.ri.gov 1/11/2006 4:17:38 PM >>>
Hello all.
We have a maximum-security inmate who was permitted under a previous administrator to "preach" during religious services, to an inmate
congregation. A new administrator barred the inmate from preaching,
and he sued us under the Religious Land Use of Institutionalized Persons Act (RLUIPA). Our motion for summary judgment was recommended to be granted by the Federal Magistrate, and is now pending before the Federal Judge. The ACLU has entered on the inmate's behalf. The ACLU argues that if the inmate is supervised, then he should be allowed to preach; and that since nothing bad has happened up to now, we can't stop him from preaching.

My argument is essentially that there is no "least restrictive means" to accommodate the inmate's desire to preach, as permitting him to preach places him in a position of authority, or perceived authority among inmates, which is threatening to security.
The fact that nothing bad happened during the 7 years he was permitted to preach does not preclude us from acting preemptively to prevent something bad from happening now.

Have any of you dealt with inmates who want to lead or preach during religious services?

Do any of your Departments have written policy that permit or prohibit such preaching?

Thank you for any help you can lend

Patricia A. Coyne-Fague
Chief Legal Counsel
RI Department of Corrections
40 Howard Avenue
Cranston, RI 02920
(401) 462-0145
(401) 462-2583
patricia.coyne-fague@doc.ri.gov

---
You are currently subscribed to clc as: nancy.white@state.ma.us. To unsubscribe send a blank email to leave-clc-8796D@www.nicic.org

**Coyne-Fague, Patricia**

**From:** Trout, Gregory [Gregory.Trout@odrc.state.oh.us]
**Sent:** Wednesday, January 18, 2006 1:55 PM
**To:** Chief Legal Counsel
**Subject:** [clc] RE: RLUIPA

Ohio's policy on religious services for inmates, 72 REG 01, provides, in part:

"VI. PROCEDURES
A. Congregate Services.

* * *

3. .... In no event will inmates be permitted to lead or conduct
congregate services other than , to read from texts, or to lead prayers, as approved by the chaplain."

Our maximum security riot in 1993 began with a small number of inmates who met in the religious area with little supervision.

Greg Trout

-----Original Message-----
From: patricia.coyne-fague@doc.ri.gov [mailto:patricia.coyne-fague@doc.ri.gov]
Sent: Wednesday, January 11, 2006 4:18 PM
To: Chief Legal Counsel
Subject: [clc] RLUIPA

Hello all.
We have a maximum-security inmate who was permitted under a previous administrator to "preach" during religious services, to an inmate
congregation. A new administrator barred the inmate from preaching,
and he sued us under the Religious Land Use of Institutionalized Persons Act (RLUIPA). Our motion for summary judgment was recommended to be granted by the Federal Magistrate, and is now pending before the Federal Judge. The ACLU has entered on the inmate's behalf. The ACLU argues that if the inmate is supervised, then he should be allowed to preach; and that since nothing bad has happened up to now, we can't stop him from preaching.

My argument is essentially that there is no "least restrictive means" to accommodate the inmate's desire to preach, as permitting him to preach places him in a position of authority, or perceived authority among inmates, which is threatening to security. The fact that nothing bad happened during the 7 years he was permitted to preach does not preclude us from acting preemptively to prevent something bad from happening now.

Have any of you dealt with inmates who want to lead or preach during religious services?

Do any of your Departments have written policy that permit or prohibit such preaching?

Thank you for any help you can lend

Patricia A. Coyne-Fague
Chief Legal Counsel
RI Department of Corrections
40 Howard Avenue
Cranston, RI 02920
(401) 462-0145
(401) 462-2583
patricia.coyne-fague@doc.ri.gov

## Coyne-Fague, Patricia

**From:** Van Valkenburgh Jefry [jef.vanvalkenburgh@doj.state.or.us]
**Sent:** Thursday, January 12, 2006 1:56 PM
**To:** Coyne-Fague, Patricia
**Cc:** OCONNOR Tom P
**Subject:** [clc] RLUIPA

Patricia,

We successfully defended a similar policy in Oregon under the former RFRA. We have also responded to a US DOJ BJS Office of Civil Rights investigation into a complaint of religious discrimination filed by a Native American inmate that raised the same claim, among others. Following receipt of our response, that office dismissed its investigation without further action. Below is an excerpt from my response to the feds on this issue, which includes some information that may be useful to you:

> Oregon's prison system, like that in many other states, prohibits inmates from conducting or leading religious services and activities themselves. OAR 291-143-0070(4) provides:
>
> > Inmates incarcerated in Department of Corrections facilities shall not be permitted to direct, lead or conduct other inmates in religious activities. If neither the chaplain or designee, nor a qualified religious volunteer, are available to conduct a religious activity requested by an inmate, the inmate's request will be denied until such time as a qualified religious volunteer becomes available to do so.
>
> A "religious volunteer" is defined, in pertinent part, by OAR 291-143-0010(9) as:
>
> > A member of the clergy, medicine person, imam, Rabbi, spiritual advisor, or other religious authority qualified to direct, lead and/or conduct others in the rites, ceremonies or other practices of a religion who has been approved by the Department of Corrections to assist inmates in requested religious activities in Department of Corrections facilities.
>
> The penological justification for ODOC's rules is plain and borne of experience in Oregon and in other states:
>
> > These rules were promulgated at the direction of [ODOC's former Director] Cook. The policy embodied in OAR 291-143-0070(4) is the preferred practice, from a correctional management standpoint, and is based on obvious penological concerns. Allowing inmate-led religious services poses the potential for the establishment of inmate religious leaders within the prisons who acquire power over other inmates. With the acquisition of that power over inmate followers, inmate religious leaders can use the strength of numbers to intimidate other inmates, extort favors and, in some cases, challenge the authority of prison staff.
> >
> > Inmate-led religious services and inmate religious leaders have been implicated in some very serious disruptions and severe riot conditions in both ODOC institutions and in other prisons nationwide. Cook is aware of prison riots at the Trenton State Prison in 1988, the Southern Ohio Correctional facility in Lucasville, Ohio in 1993, the Federal Correctional Institution at Sheridan, Oregon in 1990, and elsewhere, that were caused or directed by

> inmate religious leaders. One of the religious leaders implicated in the 1988 riot at the Trenton State Prison, Ali Abdul-Habib Hakeem, was subsequently transferred to Oregon and administratively segregated to remove him from his power base in New Jersey.

ODOC prisons have also had problems with inmate-led religious ceremonies. Marijuana was used in a Native American ceremonial pipe in June, 1995, by inmate participants at an inmate-led Sweat Lodge Ceremony at the South Fork Forest Camp. At the Eastern Oregon Correctional Institution, Muslim inmates confronted each other during a Qur'an study session, and Native American inmates engineered the resignation of a Native American volunteer so they could conduct their own, inmate-led ceremonies. Allowing inmates to conduct religious activities can lead to internecine religious struggles for group control, factional squabbling and the development of rival splinter groups, as well as conflict between religious groups as those groups vie for control of larger inmate bases. Allowing inmate religious leaders to conduct ceremonies for any religious group they choose to form would effectively permit an uncontrolled forum for a quasi-religious, racial or cultural heritage group that wanted to set up in a prison. White supremacist "churches" and similar racially and culturally based "heritage churches" would be allowed to flourish. The activities of these inmate religious groups would be difficult, if not impossible, to manage effectively in a prison setting. Morrison v. Cook, Fed. Civ. No. 97-57-ST, 1999 WL 717218, at 4-5 (D. Or. 1999).

Challenges to the constitutionality of a rule banning inmate-led religious activities in prison have been rejected by virtually every court that has considered the question. See, e.g., Benjamin v. Coughlin, 905 F.2d 571-78 (2nd Cir.), cert. denied, 498 U.S. 951, 111 S. Ct. 372, 112 L.Ed.2d 335 (1990); Cooper v. Tard, 855 F.2d 125, 129 (3rd Cir. 1988) ("[w]e have no difficultly sustaining the regulation against the [Turner] tests"); Johnson-Bey v. Lane, 863 F.2d 1308 (7th Cir. 1988) (a prison "need not yield to their desire to invite convicted felons, frocked or unfrocked, to conduct religious services in the prison"). Moreover, as observed by the United States District Court in Oregon, ODOC's rule banning inmate-led religious activities in Oregon's prisons has thrice previously been upheld in that court in the face of challenges under the much more restrictive standards of the Religious Freedom Restoration Act of 1993 ("RFRA")(which was itself later invalidated by the Supreme Court as applied to the states in City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). Morrison v. Cook, supra, 1999 WL 717218, at 10 (citing Cannell v. Cook, Fed. Civ. No. 95-1621-PA; Redwoman v. Cook, Fed. Civ. No. 95-515-PA; and Van Pelt v. Cook, Fed. Civ. No. 96-225-PA. Furthermore, all three decisions were subsequently affirmed on appeal to the Ninth Circuit Court of Appeals by an unreported decision, Cannell v. Cook, 133 F.3d 925 (9th Cir. 1998).

Jef

Jefry J. Van Valkenburgh, Sr. Assistant Attorney General
Government Services Section, General Counsel Division
Oregon Department of Justice
tel: (503) 947-4520 fax: (503) 378-6829

*****CONFIDENTIALITY NOTICE*****

This e-mail may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. If you are not the addressee or it appears from the context or otherwise that you have received this e-mail in error, please advise me immediately by reply e-mail, keep the contents confidential, and immediately delete the message and any attachments from your system.

## Coyne-Fague, Patricia

**From:** Linden Appel [LindenA@kdoc.dc.state.ks.us]
**Sent:** Wednesday, January 11, 2006 4:50 PM
**To:** Chief Legal Counsel
**Subject:** [clc] RE: RLUIPA

Kansas prohibits inmates from acting in the capacity of clergy or religious instructors, except for a limited circumstance where a religious group can not attract an outside clergyperson to officiate at group services. Then, upon recommendation of the chaplain and approval by the warden, the inmates involved may hold religious services among themselves, though by practice and under facility general orders, they are supervised by security staff. The two regulations involved are K.A.R. 44-12-325, Inmate activity, and 44-7-113, Religious activity.

Patricia, I'll fax those regulations to you shortly.

-----Original Message-----
From: patricia.coyne-fague@doc.ri.gov [mailto:patricia.coyne-fague@doc.ri.gov]
Sent: Wednesday, January 11, 2006 3:18 PM
To: Chief Legal Counsel
Subject: [clc] RLUIPA

Hello all.
We have a maximum-security inmate who was permitted under a previous administrator to "preach" during religious services, to an inmate
congregation. A new administrator barred the inmate from preaching, and he
sued us under the Religious Land Use of Institutionalized Persons Act (RLUIPA). Our motion for summary judgment was recommended to be granted by the Federal Magistrate, and is now pending before the Federal Judge. The ACLU has entered on the inmate's behalf. The ACLU argues that if the inmate is supervised, then he should be allowed to preach; and that since nothing bad has happened up to now, we can't stop him from preaching.

My argument is essentially that there is no "least restrictive means" to accommodate the inmate's desire to preach, as permitting him to preach places him in a position of authority, or perceived authority among inmates, which is threatening to security. The fact that nothing bad happened during the 7 years he was permitted to preach does not preclude us from acting preemptively to prevent something bad from happening now.

Have any of you dealt with inmates who want to lead or preach during religious services?

Do any of your Departments have written policy that permit or prohibit such preaching?

Thank you for any help you can lend

Patricia A. Coyne-Fague
Chief Legal Counsel
RI Department of Corrections
40 Howard Avenue
Cranston, RI 02920
(401) 462-0145
(401) 462-2583
patricia.coyne-fague@doc.ri.gov

---
You are currently subscribed to clc as: LindenA@kdoc.dc.state.ks.us. To unsubscribe send a blank email to leave-clc-12948I@www.nicic.org

---

## Coyne-Fague, Patricia

**From:** Susan VanBaalen [SVanBaalen@bop.gov]
**Sent:** Thursday, February 23, 2006 2:28 PM
**To:** Coyne-Fague, Patricia
**Subject:** Bureau of Prisons policy re: inmate led religious ceremonies

Yes, that is correct.

>>> "Coyne-Fague, Patricia" <Patricia.Coyne-Fague@doc.ri.gov> 2/23/2006
2:13 PM >>>
Thank you again for speaking to me about this issue.

I want to make sure I understand the BOP policy:

Inmate-led religious services/ceremonies are only permitted, and then only under strict staff supervision, when an outside clergy member cannot be found to facilitate that service, or if the religion is of the type that doesn't utilize an officiant or leader.

Is that basically right?

Thanks again.

Patricia A. Coyne-Fague

Chief Legal Counsel

RI Department of Corrections