UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **WESLEY SPRATT,** Plaintiff | ) | |
| vs. | ) | **C.A. No.: 04-112S** |
| **A.T. WALL, et al.,** Defendants. | ) | |

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF OBJECTION TO REPORT AND RECOMMENDATION ("R&R")**

## I. Introduction.

In November 2005, the Magistrate Judge in this case issued a Report & Recommendation ("R&R"), in favor of granting Defendant's Motion for Summary Judgment. Plaintiff objected and Defendant filed a response. The following constitutes Plaintiff's reply to that response pursuant to Local Rule 72(d).

## II. Discussion.

*A. The U.S. Supreme Court's Most Recent Religious Freedom Decision Demonstrates the State Cannot Rely on Speculation to Satisfy its Burden under RLUIPA.*

As stated in Plaintiff's main brief, the Religious Land Use and Institutionalized Persons Act ("RLUIPA") provides that, "'No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution,' unless the burden furthers 'a compelling governmental interest,' and does so by 'the least restrictive

means.'" Cutter v. Wilkinson, 125 S.Ct. 2113, 2116, 161 L.Ed. 1020 (2005) (quoting 42 U.S.C. § 2000cc-1(a)(1)-(2). Recently, the United States Supreme Court decided a religious freedom case under RLUIPA's predecessor,[1] the Religious Freedom Restoration Act, declaring that a government cannot assert purely categorical or speculative arguments against making religious accommodations. See Gonzalez v. O Centro Espirita Beneficente Uniao Do Vegetal, 546 U.S. ___, 163 L.Ed.2d 1017 (2006). Instead, the government's analysis must be individualized and case-specific. Id. Because this is exactly what the State failed to do in this case, a closer look at Gonzalez is warranted.

In Gonzalez, a religious sect used a sacramental tea made from two Amazon-region plants. Id. at 1028. One of the plants contained hallucinogens which were illegal under the federal Controlled Substances Act ("Act"). Id. Accordingly, in 1999, U.S. Customs intercepted and seized a tea delivery. Id. The sect sued the federal government, arguing that applying the Act to the sacramental use of tea violated the RFRA. Id. In the district court, the government argued that applying the Act was the least restrictive means of advancing compelling government interests. Id. at 1028-29. In particular, the government asserted that it had a compelling interest in protecting the health and safety of the church members, preventing the diversion of the tea to non-members, and complying with an international

[1]The RFRA contains the same standards as RLUIPA. One difference is that the RLUIPA is restricted to prison and land use cases. However, the U.S. Supreme Court has looked to RLUIPA cases in interpreting RFRA cases and vice-versa. See, e.g., Gonzalez at *35.

treaty on psychotropic substances. The Court found the evidence was evenly balanced on both the health and diversion concerns of the government. Id. at 1029. Because the evidence was balanced, the government failed to show a compelling interest existed that justified a substantial burden on the sect's sincere religious exercise. Id.[2] Accordingly, the Court entered a preliminary injunction allowing the church to import the tea pursuant to federal permits, restricting control over tea to church authority and warning certain members against dangers associated with the tea. Id. The Court also set forth procedures the government could follow, if in fact, the tea negatively affected members or a particular shipment had particularly dangerous levels of the hallucinogen. The Tenth Circuit affirmed. Id.

On appeal, the government argued that the Act serves a compelling purpose and that no exceptions should be made, no matter what the particular situation of the church. Id. at 1031. This line of argument was rejected outright by the Supreme Court. Id. at 1031-32. In particular, the Court found that the government's ability to demonstrate compelling interest must be tied to the circumstances of the case, and not on a broad categorical approach. Id. at 1032-33. The Court noted that the government's argument for uniformity:

> "rests not so much on a particular statutory program at issue as on a slippery-slope concerns that could be invoked in response to any RFRA claim for an exception to a generally applicable law. The Government's argument echoes the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions." Id. at 1035.

---

[2]The Court rejected the "international treaty" justification, finding that it did not apply to the tea. Id. at 1029.

The Court also relied on Cutter, a RLUIPA case, and noted that it had "reaffirmed just last term the feasibility of case-by-case consideration of religious exemptions to generally applicable rules." Id. at 1035 (citing Cutter, 544 U.S. ___, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005)).

Gonzalez is another basis for rejecting the State's arguments in this case. Here, the State has merely invoked the slippery-slope argument - - and its speculation that allowing Spratt to continue participating in the church service will lead to dire consequences. However, that speculation and fear is not based on any individualized circumstances related in any way to Spratt or the ACI. Instead, ACI management's speculation was generated after-the-fact - - on reasons not advanced at the time the prison decided to stop Spratt. Allowing this shoddy explanation to support the "compelling interest" analysis of RLUIPA is totally inconsistent with the statute, and with the Supreme Court's interpretation of the state's burden thereunder.

*B. None of the State's Further Arguments Justify Summary Judgment.*

The State has presented a new argument to the Court, not raised before the Magistrate, that because other prison systems supposedly bar inmates from leading religious services, it is somehow justified in barring Spratt from preaching during one held at the ACI. This new argument should not be considered by the Court for several reasons. First, this argument was not raised to the Magistrate and thus, it is waived. See, e.g., Guzman-Ruiz v. Hernandez-Colon, 406 F.3d 31, 36 (1st Cir. 2005) (ruling that plaintiff's request that the Court take

notice of additional argument and evidence not presented to magistrate on summary judgment is deemed waived) (citing Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988)); see also John Hancock Mutual Life Ins. Co. v. Weisman, 27 F.3d 500, 506 (10th Cir. 1994). In addition, this new information did not form the basis of the magistrate's decision, or the decision of the ACI in banning Spratt from preaching during the service, and as such, it should be ignored as providing any justification for the decision. Finally, although it appears that DOC counsel solicited a response from all "Chief Legal Counsel" it appears that only a few responses were attached to the memorandum. One is left to wonder what the other hundreds of prisons allow?

Even if this information can be considered, the situation presented by DOC counsel to other "Chief Legal Counsel" differs markedly from the present facts. DOC counsel did not explain that the service was not inmate-led, but rather clergy-led with an inmate having a part in the service. Thus, the fact that Connecticut responded that it does not permit inmate-led religious services begs the question of whether inmate-participation (in the form of reading and expounding on the scriptures) is prohibited. Massachusetts responded in the same manner - and added that it does not permit inmates to control others. This again, begs the question of whether Spratt controlled anyone or whether there was any suspicion of control at that time. There was no finding by the DOC prior to stopping Spratt from preaching that he was controlling anyone. There is no evidence of how many inmates attend the services and what effect, if any, Spratt's participation in the service had on them. Also,

if anything, the e-mail from Ohio supports Spratt's argument. Ohio allows inmates "to read from texts, or to **lead** prayers, as approved by the chaplains."[3]

In all events, this information about other prison practices can only be used as an example to defeat the DOC's argument that a blanket ban is justified in all situations.[4] As is made clear by Gonzalez - that type of categorical approach is disallowed under religious freedom laws and cannot be the basis for the Magistrate's decision here.

The DOC also argues that the prison has a right to act preemptively when taking certain actions - before a breach of security actually occurs. While that may be true in the ordinary case, that argument will not necessarily hold up under RLUIPA depending on the particular facts and circumstances involved. For example, the three cases relied upon the State in its "preemptive right" argument are all non-RLUIPA cases.[5] Two were decided

---

[3]Interestingly, in the State's factual recitation it notes that "[t]he Warden's position was that while any inmate could perform scripture readings or recite prayers, to permit a prison inmate to expound upon the scriptures before a congregation of other prison inmates represented a threat to institutional security * * *." State's Brief, p. 2. If the Warden sought only to prevent Spratt from expounding, he would still be reading prayers today. As far as this writer is aware, Spratt has been prevented from both reading and expounding which shows that the least restrictive means was not even considered. If reciting of prayers is permissible, what is the difference between talking about them in terms of perceived leadership? The fact that Spratt has been removed from any participation (in the form of reading or expounding) demonstrates that the DOC prohibition is both baseless and irrational.

[4]In the event the Court considers the e-mails in its decisions, it should also consider the entire BOP policy, which again, according to Plaintiff's reading, allows for the type of participation he engaged in for seven years. See Exhibit A.

[5]As stated in Plaintiff's main brief, the State's repetitive reference to non-RLUIPA cases cannot be persuasive based on the disparity in the applicable standards.

under the Turner standard which held that as long as the State action met a legitimate penological interest, it was justified. See Thornburgh v. Abbott, 490 U.S. 401 (1989); Friedman v. Arizona, 912 F.2d 328 (9th Cir. 1990). A very different standard is applicable here, and thus, it is likely that a changed outcome would result if those cases were brought under RLUIPA.

## III. Conclusion.

One need consider only the fact that every rationale offered by the DOC in support of its decision to ban Spratt has been generated after-the-fact based on pure speculation. That speculation is proven false by the seven-year-history of Spratt's participation in church services without incident. None of the DOC's justifications are based on Spratt himself, or the individualized circumstances of the case, but instead, on categorical, blanket assumptions, not supported by reality here. Based upon the foregoing, Plaintiff respectfully requests that this Court vacate summary judgment in favor of the DOC, and instead, enter summary judgment in Plaintiff's favor.

Plaintiff,
By his attorney,

Carly Beauvais Iafrate, #6343
Rhode Island Affiliate,
American Civil Liberties Union
170 Westminster St., Suite 601
Providence, RI 02903
(401) 421-0966

(401) 351-4802 (fax)

**CERTIFICATION**

I hereby certify that a true copy of the within document to Patricia A. Coyne-Fague, Rhode Island Department of Corrections, 40 Howard Avenue, Cranston, RI 02920 on the 15th day of March 2006.

# Exhibit A

**U.S. Department of Justice**
Federal Bureau of Prisons

# Program Statement

**OPI:** CPD/RSB
**NUMBER:** P5360.09
**DATE:** 12/31/2004
**SUBJECT:** Religious Beliefs and Practices

1. [<u>PURPOSE AND SCOPE</u> §548.10.(a) **The Bureau of Prisons provides inmates of all faith groups with reasonable and equitable opportunities to pursue religious beliefs and practices, within the constraints of budgetary limitations and consistent with the security and orderly running of the institution and the Bureau of Prisons.]**

2. **SUMMARY OF CHANGES**

- The use and type of religious headwear and religious garments are delineated;
- Due dates for the annual report have been changed;
- Some of the implementing text has been moved under appropriate rules language sections;
- The religious diet accommodation for the certified food component has been modified;
- The credentials required for religious contracts and volunteers have been clarified. The required forms have been developed;
- Any religious group whose doctrine, rituals or practices espouse domestic and/or foreign terrorism, or advocates any type of violence will not be authorized to meet;
- Staff supervision requirements for inmate religious programs is delineated;
- Language requirements used in religious programming is defined;
- The unauthorized religious practices are expanded to include language or behaviors that could be reasonably construed as a threat to safety, security, or orderly running of the institution; and,
- The Ceremonial Meal Equity Formula Threshold is modified.

3. **PROGRAM OBJECTIVES.** The expected results of this program are:

a. Religious accommodations will be made for all religions authorized to meet in Bureau of Prisons facilities.

b. The religious rights of inmates of all faiths will be protected within the parameters of the security and orderly running of the institution.

c. Religious resources will be equitably distributed for the benefit of all inmates.

d. Pastoral care will be available to inmates and staff.

e. Expertise on matters of religion in the correctional environment will be available for staff.

**[Rules - Bracketed Bold]**
Implementing Text - Regular Type

4. **DIRECTIVES AFFECTED**

a. **Directive Rescinded**

P5360.08 Religious Beliefs and Practices (5/25/01)

b. **Directives Referenced**

| | |
|---|---|
| P1350.02 | Donations, Acceptance of (6/29/98) |
| P3420.09 | Standards of Employee Conduct (2/5/99) |
| P3939.07 | Chaplains, Employment, Responsibilities and Endorsements (10/26/01) |
| P4510.05 | Inmate Contributions (1/26/99) |
| P4761.04 | Special Foods or Meals From Outside Sources Introduced into Institutions (4/22/96) |
| P5264.07 | Telephone Regulations for Inmates (1/31/02) |
| P5266.10 | Incoming Publications (1/10/03) |
| P5267.07 | Visiting Regulations (4/14/03) |
| P5280.08 | Furloughs (2/4/98) |
| P5300.20 | Volunteers and Citizens Participation Programs Manual (6/1/99) |
| P5326.04 | Marriages of Inmates (12/17/98) |
| P5500.11 | Correctional Services Manual (10/10/03) |
| P5500.12 | Correctional Services Procedures Manual (10/10/03) |
| P5538.04 | Escorted Trips (12/23/96) |
| P5553.06 | Escapes/Death Notification (8/23/99) |
| P5580.06 | Personal Property, Inmate (7/19/99) |
| P5800.12 | Receiving and Discharge Manual (12/31/97) |
| T5303.01 | Ministry of the Bureau Chaplains (6/1/95) |
| T5360.01 | Practical Guidelines for Administration of Inmate Religious Beliefs and Practices (3/27/02) |

c. Rules cited in this Program Statement are contained in 28 CFR §548.10-20 and 28 CFR §540.48.

5. **STANDARDS REFERENCED**

a. American Correctional Association Standards for Adult Correctional Institutions 3rd Edition: 3-4261, 3-4265, 3-4274, 3-4300, 3-4301, 3-4374, 3-4375, 3-4387, 3-4454, 3-4455, 3-4456, 3-4457, 3-4458, 3-4459, 3-4460, 3-4461, 3-4462, and 3-4463

b. American Correctional Association Standards for Adult Local Detention Facilities 3rd Edition: 3-ALDF-3D-24, 3-ALDF-3E-04, 3-ALDF-4C-07, 3-ALDF-4C-08, 3-ALDF-4E-44, 3-ALDF-4E-45, 3-ALDF-4F-04, 3-ALDF-5F-01, 3-ALDF-5F-02, 3-ALDF-5F-03, 3-ALDF-5F-04, 3-ALDF-5F-05, 3-ALDF-5F-06, 3-ALDF-5F-07, 3-ALDF-5F-09, and 3-ALDF-5F-10

c. American Correctional Association 2nd Edition Standards for the Administration of Correctional Agencies: 2-CO-5E-01

6. **PRETRIAL, HOLDOVER, AND DETAINEE PROCEDURES.** Procedures in this Program Statement apply to Pretrial, Holdover, and Detainee Centers. The exception to these procedures exists where building design prevents the maintenance of an outside worship area, including the sweat lodge (see Section 12.c. of this Program Statement).

7. <u>**RELIGIOUS OPPORTUNITIES AND LIMITATIONS**</u> **§548.10 (b) [When considered necessary for the security or good order of the institution, the warden may limit attendance at or discontinue a religious activity. Opportunities for religious activities are open to the entire inmate population, without regard to race, color, nationality, or ordinarily, creed. The warden, after consulting with the institution chaplain, may limit participation in a particular religious activity or practice to the members of that religious group. Ordinarily, when the nature of the activity or practice (e.g., religious fasts, wearing of headwear, work proscription, ceremonial meals) indicates a need for such a limitation, only those inmates whose files reflect the pertinent religious preference will be included.]**

a. **Religious Accommodation.** The level of scheduled activities is expected to be commensurate with the institution's mission/need. Authorized congregate services will be made available for all inmates weekly with the exception of those detained in any Special Housing Units (SHUs). If a state of emergency exists (e.g. fog, institution lock down, food strike), the warden or designee will determine the appropriate level of

chapel programming. Inmates may recite formulaic prayers in the language required by their religion. Sermons, original oratory, teachings and admonitions must be delivered in English. The warden may authorize the delivery of programs in other languages only when it is appropriate to accommodate the overall needs of the population. Best correctional practices for each religion are included in the Practical Guidelines for Administration of Inmate Religious Beliefs and Practices Technical Reference Manual.

The Warden may periodically review religious practices to determine whether a religious practice remains within the scope of best correctional practice and religious accommodation. If upon review, the Warden determines that a religious practice jeopardizes institution safety, security and good order, the practice may be temporarily restricted. The religious practice may resume only upon completion of a thorough evaluation of the practice with respect to compelling government interests and least restrictive alternatives.

To ensure the safety, security and good order of the institution, any religious group that encourages domestic and/or foreign terrorism, or advocates any type of violence will not be authorized to meet.

b. **Religious Use of Wine.** Inmates may be permitted to receive small amounts of wine as part of a religious ritual only when administered under the supervision of BOP chaplains, clergy contractors, or clergy volunteers authorized by the Bureau to perform the ritual.

Because wine is otherwise a contraband substance, it can be dispensed only under strict control and supervision. Inmates will not be allowed to give wine to other inmates. For this PS' purposes, the consumption of wine under these circumstances will not be considered consumption of alcohol or ingestion of an illegal substance.

The institution will purchase the wine using normal procurement procedures. Wine will be secured in an appropriate area of the chapel. For scheduled services for which wine is authorized, chaplaincy staff will provide the wine to the contract or volunteer community minister in a disposable 2 ounce covered container. The container will be used to measure and transport the wine. The minister will dispose of the empty 2 ounce container or any unused portion of the wine to protect against contamination or abuse. The chaplain will inform staff of

procedures for procuring, storing, and using wine. This is accomplished through ongoing training to avoid unnecessary and potentially disruptive confiscation of essential sacred elements.

c. **Unauthorized Practices.** The following religious practices and activities are never authorized:

- animal sacrifice;
- language or behaviors that could reasonably be construed as a threat to safety, security, or the orderly running of the institution,(e.g., curses);
- nudity;
- self-mutilation;
- use, display, or possession of weapons or what appears to be a weapon (e.g., paper sword);
- paramilitary exercises;
- self-defense training;
- sexual acts;
- profanity;
- consumption of alcohol (except as noted in 7b, Religious Use of Wine);
- ingestion of illegal substances;
- proselytizing;
- encryption; and
- disparagement of other religions.

d. **Supervision of Inmates.** Ordinarily the level of supervision of inmate religious groups in secure facilities will follow these guidelines for religious programs involving worship, study or meetings.

- Inmate-led religious programs require constant staff supervision.
- Religious programs with Level I volunteers require constant staff supervision.
- Religious programs led by Level II volunteers and contractors require intermittent visual and audio supervision by staff. This applies to both escorted and unescorted volunteers and contractors.
- Special Religious Programs (e.g. choirs, concerts, seminars) require constant staff supervision.

When necessary, Wardens may identify alternative practices and implement the least restrictive alternative consistent with the security and orderly running of Bureau institutions.

8. **RELIGIOUS PREFERENCES** **§548.10 (c) [The Bureau of Prisons does not require an inmate to profess a religious belief. An**

**inmate may designate any or no religious preference at his/her initial team screening. By notifying the chaplain in writing, an inmate may request to change this designation at any time, and the change will be effected in a timely fashion.]**

Unit staff will enter the initial religious preference (RLG) assignment into SENTRY at the inmate's initial classification. When the chaplain approves an inmate's request for changing a religious preference, the chaplain is responsible for making the necessary change in the SENTRY RLG assignment.

To maintain the security and orderly running of the institution, and to prevent abuse or disrespect by inmates, the chaplain will monitor patterns of changes in the inmate's declarations of religious preference.

In determining whether to allow an inmate to participate in a specific religious activity, as described in Section 7, [§548.10(b)] above, staff may wish to refer to the information reported on the intake screening form and the inmate's religious preference history. Inmates showing "No Preference" or indicating membership in a different faith group may be restricted from participating in activities deemed appropriate for members only.

9. **[DEFINITION §548.11. For purposes of this subpart, the term "religious activity" includes religious diets, services, ceremonies, and meetings.]**

10. **[CHAPLAINS §548.12. Institution chaplains are responsible for managing religious activities within the institution. Institution chaplains are available upon request to provide pastoral care and counseling to inmates through group programs and individual services. Pastoral care and counseling from representatives in the community are available in accordance with the provisions of §§ 548.14 and 548.19. The chaplain may ask the requesting inmate to provide information regarding specific requested religious activities for the purpose of making an informed decision regarding the request.]**

28 CFR §548.14 and §548.19 refer to Sections 12 and 17, respectively, of this PS.

a. **Chaplains as Pastoral Care Providers.** The chaplaincy department is directed by full-time Bureau chaplains. All chaplains are qualified pastoral care providers who have verifiable religious credentials and current religious endorsements.

Chaplains plan, direct, and supervise all aspects of the religious program and have physical access to all areas of the institution to minister to inmates and staff. All institution chaplains are employed to:

- lead worship services in their own tradition (e.g., General Christian, Jewish, Buddhist, Catholic);
- provide professional spiritual leadership and pastoral care;
- accommodate the legitimate religious needs of inmates; and
- supervise institution religious activities.

Chaplaincy Services support staff may assist the chaplains in supervising the institution's religious activities and administrative duties, but may not perform duties reserved for professional chaplains.

(1) **SHU Religious Access**. Ordinarily, all inmates, except those in the SHU, have access to regularly scheduled congregate services. Inmates of all faiths will have regular access to chaplains. Upon written request, inmates may also have access to recognized representatives of their faith groups while in SHUs. Each chaplain will provide pastoral care in SHUs and hospital units weekly.

Chaplains will provide opportunities for individuals to receive the sacraments and sacred rituals in SHUs. This includes, but is not limited to, communion and Sabbath prayer items--matzo and grape juice. Ordinarily, sacred pipe use will be accommodated in Administrative Detention. The Warden may determine the circumstances under which the sacred pipe may be used in Disciplinary Segregation.

(2) **Telephone Calls**. Individual pastoral care includes counseling inmates and/or their families in personal crisis and family emergency situations. When authorized by the warden, chaplains may facilitate inmate telephone calls in emergency situations. No other chapel staff are authorized to facilitate these calls.

Each Chapel will be equipped with an additional telephone which is capable of recording inmate telephone conversations during the pastoral calls. A notice in English and Spanish will be placed at the telephone location to advise the user that all conversations are subject to recording and that using the telephone constitutes consent. This telephone will be separate from the telephones provided for staff use.

Chaplains will also maintain a telephone log which includes:

- the date, telephone number, and person called;
- name and register number of the inmate; and
- a brief reason for the call.

(3) **Women and Special Needs Inmates**

(a) Pregnant inmates will be offered religious counseling to aid in making an informed decision whether to carry the pregnancy to full term.

(b) The particular needs of women and special needs inmates may require the contracting of spiritual counselors or advisers for religious needs other than those of a specific faith tradition.

(4) **Deaths and Serious Illnesses.** Each institution will establish clear procedures to involve a chaplain in notifying inmates and/or their families of serious illness or death of either inmates or their family members. The chaplain will coordinate appropriate religious rituals at the time of an inmate's serious illness or death.

Also, the chaplain may advise the Warden regarding religious factors which may influence decisions concerning the performance of autopsies on deceased inmates and the proper disposition of the remains.

b. **Introduction of New and Unfamiliar Religious Components.** Inmates may request the introduction of new or unfamiliar religious components into the Chaplaincy Services program. When information is required regarding a specific new practice, the chaplain may ask the inmate to provide additional information which would be considered when deciding to include or exclude the practice from the Chaplaincy Services program.

(1) **Religious Issues Committee (RIC).** When a decision cannot be reached locally, a RIC at the Central Office, appointed by the Assistant Director, Correctional Programs Division (CPD), will review inmate requests for introducing new religious components into the overall religious program.

The RIC is to meet as necessary and maintain records of its recommendations. Periodically, the RIC will issue summary reports and recommendations to all Chief Executive Officers.

(2) **Requests.** Inmate requests are made by completing the New or Unfamiliar Religious Components Questionnaire form (BP-S822). This form, along with sufficient documentation on which to base an informed decision, will be submitted to the chaplain for routing to the Central Office RIC through the Warden and Regional Director.

Upon completing the review, the RIC will make recommendations to the Warden regarding the request's appropriateness. The Warden will determine the local disposition of the request after the institution receives the RIC recommendations.

(3) **Implementation of the RIC Recommendation.** Decisions regarding the Chaplaincy Services program's expansion rest with the Warden and are subject to the institution's parameters for maintaining a safe and secure institution and availability of staff for supervision.

11. **[SCHEDULES AND FACILITIES §548.13**

**a. Under the general supervision of the warden, chaplains shall schedule and direct the institution's religious activities.]**

Current program schedules will be posted in English and Spanish on bulletin boards clearly visible to the inmate population.

**[b. The warden may relieve an inmate from an institution program or assignment if a religious activity is also scheduled at that time.]**

In scheduling authorized religious activities, chaplains will consider both the availability of staff supervision and the need to share the time and space available among the eligible groups.

**[c. Institutions shall have space designated for the conduct of religious activities.]**

This designated space will be sufficient to accommodate the needs of all religious groups in the inmate population fairly and equitably. Chaplaincy Services areas (inside and outside) will be neutral and suitable for use by various faith groups. The general area will include:

- office space for each chaplain;
- storage space for the needs of the religious programs; and

- proximity to lavatory facilities for staff and volunteers.

Management will make every possible effort to provide private office space for each chaplain. One outside worship area will be maintained in a suitable, secure, and private location, except in institutions where building design or security considerations would prohibit its construction. The single outside worship area should be large enough to accommodate all faith traditions requiring outside worship space.

12. **[<u>COMMUNITY INVOLVEMENT (VOLUNTEERS, CONTRACTORS)</u> §548.14**

**a. The institution's chaplain may contract with representatives of faith groups in the community to provide specific religious services which the chaplain cannot personally deliver due to, ordinarily, religious prescriptions or ecclesiastical constraints to which the chaplain adheres.]**

The term "representatives of faith groups" includes both clergy and spiritual advisors. All contractual representatives of inmate faith groups will be afforded equal status and treatment to help inmates observe their religious beliefs, unless the security and orderly running of the institution warrants otherwise. The volunteer must complete the Credentials of Religious Volunteer form (BP-S777) prior to his or her becoming a badged volunteer. The form will be maintained in the Official Volunteer File.

**[b. The institution chaplain may secure the services of volunteers to assist inmates in observing their religious beliefs.]**

Institutions unable to secure volunteers to meet religious needs may request a written waiver from the Regional Director.

Inmates may not place volunteers or contractors on their telephone lists or use the Inmate Telephone System to contact volunteers or contractors. If a specific program need exists, the chaplain may facilitate and monitor a telephone call. A Level I volunteer, a badged volunteer (Level II), or contractor will be neither a minister of record nor placed on an inmate's visiting list.

**[c. The warden or the warden's designee (ordinarily the chaplain) may require a recognized representative of the faith group to verify a volunteer's or contractor's religious credentials prior to approving his or her entry into the institution.]**

Ordinarily, the credentials required for conducting worship services will be ordination. In lieu of ordination credentials, adequate documentation of recognized religious and ministerial position in the faith community is required.

A qualified and credentialed non-citizen may be extended a religious services contract if permitted by the annual appropriations act and immigration law.

The prospective contractor must complete the Credentials of Religious Contractor form (BP-S778) prior to Bureau allocation of appropriated funds for a contract, whether for a one-time visit by Request for Purchase or multiple visits during the fiscal year, using the normal contracting procedures. It will become part of the official Contractor Security File.

Ordinarily, inmates of any faith tradition will have access to their faith group's official representatives while in a SHU or hospital unit. Usually this does not include hospitals that are outside the secure confines of the institution. Inmates in SHU will make a written request to the chaplain for a visit with their faith representatives, and requests will be accommodated consistent with the terms of the representative's contract and the security and orderly running of the institution.

Faith group representatives will always be escorted in a SHU. As an alternative to facilitate supervision, the approved SHU visit may occur in the Visiting Room during regularly scheduled visiting hours.

13. **[<u>EQUITY</u> §548.15. No one may disparage the religious beliefs of an inmate, nor coerce or harass an inmate to change religious affiliation. Attendance at all religious activities is voluntary and, unless otherwise specifically determined by the warden, open to all.]**

14. **[<u>INMATE RELIGIOUS PROPERTY</u> §548.16**

**a. Inmate religious property includes but is not limited to rosaries and prayer beads, oils, prayer rugs, phylacteries, medicine pouches, and religious medallions. Such items, which become part of an inmate's personal property, are subject to normal considerations of safety and security. If necessary, their religious significance shall be verified by the chaplain prior to the warden's approval.]**

Personal religious items may not be purchased with appropriated funds. All personal religious property will be purchased either from commissary stock or through an approved catalogue source using the Special Purpose Order process. No religious item may have a monetary value greater than $100.

**[b. An inmate ordinarily shall be allowed to wear or use personal religious items during religious services, ceremonies, and meetings in the chapel, unless the warden determines that the wearing or use of such items would threaten institution security, safety, or good order. Upon request of the inmate, the warden may allow the wearing or use of certain religious items throughout the institution, consistent with considerations of security, safety, or good order.**

**The warden may request the chaplain to obtain direction from representatives of the inmate's faith group or other appropriate sources concerning the religious significance of the items.]**

Two types of headwear are identified, religious and ceremonial. Religious headwear is worn throughout the institution and ceremonial headwear may be worn only in the Chapel. If additional religious or ceremonial headwear not listed is requested, the procedures outlined in Section 10.b., Introduction of New and Unfamiliar Religious Components, are to be followed.

(1) **Religious Headwear.** A standard color and style generally eliminates the necessity for the religious headwear permit cards. The cards are discouraged because of the perceived connotation of religious discrimination and/or violations of religious freedom and privacy.

In order to achieve uniformity, inmates who have a SENTRY religious preference listed below are authorized to wear the following religious headwear throughout the institution including the SHU consistent with **[14b]** above:

| | | |
|---|---|---|
| Jewish | yarmulke | black or white |
| MST of A | kufi | black or white crochet cap |
| Muslim | kufi | black or white crochet cap |
| Nation of Islam | kufi | black or white crochet cap |
| Native American | headband | multi-colored |

| | | |
|---|---|---|
| Rastafarian | crown | multi-colored (red, yellow, green threads running through a black cap) |
| Sikh | turban | white |

Headwear worn throughout the institution may not contain graphics or writing. Crowns may not have a bill. Headbands can be worn only in a circle, covering the forehead but not the crown of the head. Inmates are authorized three items of religious headwear.

**Note:** MST of A refers to the Moorish Science Temple of America.

(2) **Ceremonial Headwear.** In addition, inmates who have a pertinent SENTRY religious preference may wear the following ceremonial headwear in the Chapel. These are not worn to and from the Chapel or in any other area of the institution:

| | | |
|---|---|---|
| MST of A | fez | red |
| Odinist/Ásatrú | hlath (hlad) | brown with one or more embroidered runes |

The authorized hlath must contain embroidered runes. Plain headbands without runes are not authorized. Inmates are authorized one item of ceremonial headwear.

(3) **Religious Attire for Women.** Scarves and headwraps (hijabs) are appropriate for female inmates who have identified a religious SENTRY preference of Muslim, Jewish, Native American, Rastafarian, and those of the orthodox Christian tradition:

| | | |
|---|---|---|
| Jewish | scarf | black or off-white |
| MST of A | scarf | black or off-white |
| Muslim | hijab | black or off-white |
| Nation of Islam | scarf | black or off-white |
| Rastafarian | scarf | black or off-white |
| Orthodox Christian | scarf | black or off-white |
| Native American | headband | multi-colored |

Inmates are authorized three scarves or headwraps.

Jumper dresses are always approved for women whose religion compels them to wear loose-fitting clothing for the sake of modesty. Institutions housing females should have a supply of jumper dresses available in the laundry.

(4) **Ceremonial Clothing.** At the Warden's discretion, the following articles of personal religious clothing may be worn for services in the Chapel, but not on the compound, housing units or visiting room:

| | | |
|---|---|---|
| Jewish | kittel | a white prayer robe worn during some holiday services. |
| Muslim | kurta shirt | a knee-length shirt worn during the weekly Jumah service. |
| Native American | ribbon shirt | a multi-colored shirt worn during the Pow Wow. |
| Wicca | tabbared | a hoodless poncho or cape, earth brown color, worn during services. |

For Muslims, the shalwar (baggy pants) are not authorized. A jalabiyya (full-length robe) is not authorized. The kittel and kurta shirts are authorized for men only. The ribbon shirt and tabbared may be authorized for both men and women. Islamic inmates may not hem or wear their pants above the ankle.

(5) **Ritual Underclothing.** Temple garments and tzitzis are authorized for Mormon and Jewish inmates respectively. The Temple garments or ritual underclothing are authorized for Mormon (LDS) inmates. The tallis katan or tzitzis, a small four-cornered garment, is authorized for Jewish male inmates.

(6) **Transferable Religious Property.** A list of generally authorized and transferable inmate religious property is contained in the Practical Guidelines for Administration of Inmate Beliefs and Practices TRM. Additional personal religious property items may be approved locally by the Warden, but these must be sent home when transferring to another institution. Disposable headwear is made available in Receiving and Discharge for inmates requiring headwear while in transit.

**[c. An inmate who wishes to have religious books, magazines or periodicals must comply with the general rules of the institution regarding ordering, purchasing, retaining, and accumulating personal property. Religious literature is permitted in accordance with the procedures governing incoming publications. Distribution to inmates of religious literature purchased by or donated to the Bureau of Prisons is contingent upon the chaplain's granting his or her approval.]**

Inmates desiring to subscribe to religious periodicals or purchase religious books or literature may do so following procurement policy and procedures. Retention of religious materials is governed by the provisions in the Program Statement on Inmate Personal Property. Rejection of religious publications is governed by the procedures specified in the Program Statement on Incoming Publications.

Media resources purchased with appropriated funds will be provided equitably among the various religions. All media materials must be religious in nature. Material that is not considered religious in nature may not be procured through purchase or donation. Media materials shall not denigrate or disparage any other religion or religious groups. Donated religious media resources may be accepted in accordance with the Program Statement on Acceptance of Donations.

All media resources will be previewed by staff, or any other staff-designated volunteers, prior to distribution.

15. **[WORK ASSIGNMENTS §548.17. When the religious tenets of an inmate's faith are violated or jeopardized by a particular work assignment, a different work assignment ordinarily shall be made after it is requested in writing by the inmate, and the specific religious tenets have been verified by the chaplain. Maintaining security, safety and good order in the institution are grounds for denial of such request for a different work assignment.]**

16. **[OBSERVANCE OF RELIGIOUS HOLY DAYS §548.18. Consistent with maintaining security, safety, and good order in the institution, the warden shall endeavor to facilitate the observance of important religious holy days which involve special fasts, dietary regulations, worship, or work proscription. The inmate must submit a written request to the chaplain for time off from work to observe a religious holy day. The warden may request the chaplain to consult with community representatives of the inmate's faith group and/or other appropriate sources to verify the religious significance of the requested observance.**

**The chaplain will work with requesting inmates to accommodate a proper observance of the holy day. The warden will ordinarily allow an inmate to take earned vacation days, or to make up for missed work, or to change work assignments in order to facilitate the observance of the religious holy day.]**

The Central Office Chaplaincy Services Branch, CPD, maintains a general list of recognized holy days to identify days on which inmates of various faith groups may seek to be excused from work and school attendance. The list is published annually in an Operations Memorandum (OM) but, because of the changing nature of religious observances, it is not exhaustive. Requests for days off work and school attendance by members of religions not included in the above-mentioned OM are to be given due consideration and authorized by the Warden when appropriate.

Days free from work/school are determined by the religious community standards and ordinances of faith groups. As such, the number of days off work for religious holy day observances is not limited to one per year. Absent religious community information, the Bureau does not have the religious authority to determine whether inmates should be free from work/school for religious reasons on particular days.

17. **[PASTORAL VISITS §548.19. If requested by an inmate, the chaplain shall facilitate arrangements for pastoral visits by a clergy person or representative of the inmate's faith.**

**a. The chaplain may request an NCIC check and documentation of such clergy person's or faith group representative's credentials.**

**b. Pastoral visits may not be counted as social visits. They will ordinarily take place in the visiting room during regular visiting hours.]**

(1) **Minister of Record.** For this section's purposes, the minister of record is defined as that spiritual leader, clergy person, or official representative, whom the inmate identifies and the chaplain verifies, as a minister of the inmate's religion of record.

An inmate will identify a minister of record by submitting a written request to the chaplain. The clergy person the inmate identifies will also submit a request for consideration as the minister of record to the chaplain. Following a review of the minister's credentials and appropriate security checks, the chaplain will request that unit staff place the identified clergy person on the inmate's visitor list as the minister of record. An inmate may only have one minister of record at a time.

The minister of record will not count against the total number of authorized social visitors an inmate is allowed to have on his or her visiting list. Additionally, if the institution

uses a point system to monitor social visits, visits from the minister of record will not be counted against the total number of visits allowed.

(2) **Official Visits from Faith Representatives (Other than Minister of Record).** Visits from faith representatives other than the minister of record will be in accordance with the Program Statement on Visiting Regulations and may be counted against the total number of visits allowed. The faith representative's credentials and appropriate security checks will be reviewed prior to scheduling the visit. Refer to the Special Visits section of the Program Statement on Visiting Regulations.

(3) **Location.** Visits with the minister of record or other official faith representatives will be accommodated in the visiting room during regularly scheduled visiting hours, and to the extent practicable, in an area of the visiting room which provides a degree of separation from other visitors. Upon request, the visit may occur in a private visiting section contained in the visiting area if available.

- If space is not available, the visit may be rescheduled when private accommodations can be made in the visiting room during regularly scheduled visiting hours.

The Warden may limit the number of these official visits an inmate receives each month, based upon available resources.

18. **[<u>DIETARY PRACTICES</u> §548.20**

**a. The Bureau provides inmates requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice within the constraints of budget limitations and the security and orderly running of the institution and the Bureau through a religious diet menu. The inmate will provide a written statement articulating the religious motivation for participation in the religious diet program.]**

(1) **Components.** The religious diet program, called the Alternative Diet Program, will consist of two distinct components:

- One component provides for religious dietary needs through self-selection from the main line, which includes a no-flesh option and access to the salad/hot bar (where the salad/hot bar is part of the Food

Service Program). In institutions where meals are served in prepared trays, local procedures will be established for providing the no-flesh component.

- The other component accommodates dietary needs through nationally recognized, religiously certified processed foods.

(2) **Requests and Interviews.** Inmates wishing to participate in the religious diet program will make the request in writing. Chaplains will ordinarily conduct the oral interview and complete the interview form within two working days of the request. When the interview is completed, the chaplaincy team will review the request to determine how to accommodate the inmate's stated religious dietary needs.

The inmate's interview responses will determine which component of the religious diet program best accommodates his or her religious dietary needs.

Inmates will review and sign a copy of the completed interview form. Chaplains will document an inmate's refusal to sign the document.

(3) **Notification.** Inmates will be notified on the Notification of Religious Diet Accommodation (BP-S700), of the religious diet for which they are approved, based on their religious dietary needs (BP-S700). Completed forms will be placed in section 6 of the Inmate Central File.

(4) **SENTRY Record.** The chaplain is responsible for entering pertinent information for each inmate approved to participate in the religious diet program into the SENTRY religious diet participant list within 24 hours of approval, under normal operations. Food Service will begin serving those approved for the certified processed food line normally within two days of SENTRY notification, under normal operations.

(5) **Monitoring.** Both chaplains and food service staff will monitor the SENTRY religious diet participant list daily to ensure that all eligible inmates are served religious diet meals with minimal delay upon intake or redesignation. Inmates who are not approved for the certified food line may request a re-interview at six-month intervals.

Chaplains will escort contract chaplains to the religious diet food preparation area randomly to monitor the preparation and serving of food items and compliance with religious dietary laws.

**[b. An inmate who has been approved for a religious diet menu must notify the chaplain in writing if the inmate wishes to withdraw from the religious diet. Approval for an inmate's religious diet may be withdrawn by the chaplain if the inmate is documented as being in violation of the terms of the religious diet program to which the inmate has agreed in writing. In order to preserve the integrity and orderly operation of the religious diet program and to prevent fraud, inmates who withdraw (or are removed) may not be immediately reestablished back into the program. The process of re-approving a religious diet for an inmate who voluntarily withdraws or who is removed ordinarily may extend up to thirty days. Repeated withdrawals (voluntary or otherwise), however, may result in inmates being subjected to a waiting period of up to one year.]**

Prepared and wrapped trays will be provided for inmates approved for the certified food component. Those who are observed eating from the main line may be removed temporarily from that component. In addition, those who purchase and/or consume non-certified foods from the commissary may also be temporarily removed from that component.

The Warden has authority to remove inmates from and reinstate them to the program. Ordinarily, this authority is delegated to the chaplains. Inmates will be notified in writing (BP-S820) of a religious diet violation and potential removal from the religious diet program. Removal is not punitive in nature but provides an opportunity for the inmate and staff to reevaluate this program's appropriateness to meet the inmate's demonstrated needs. At the inmate's request for reinstatement, an oral interview will be conducted prior to reinstatement.

**[c. The chaplain may arrange for inmate religious groups to have one appropriate ceremonial or commemorative meal each year for their members as identified by the religious preference reflected in the inmate's file. An inmate may attend one religious ceremonial meal in a calendar year.]**

Ceremonial or commemorative meals will be served in the Food Service facilities, unless the Warden authorizes otherwise. To maintain equity in menu design, all meals must be prepared from food items on the institution master menus.

Chaplains may use a small portion of the annual Chaplaincy Services budget to acquire traditional/ritual foods to supplement the mainline foods served for the ceremonial meal. Ritual or traditional foods must be consistent with the faith group's religious dietary laws.

If purchasing ritual/traditional foods, a per capita equity formula is to be determined locally. To determine the per capita cost, the total amount of appropriated funds designated for this purpose shall be divided by the total number of inmates participating in all ceremonial meals for the fiscal year. To prevent waste or abuse, the total amount per faith group is to be no less than $10 nor greater than $200.

The Food Services Department is to be the only source of procurement for all meal items. Foods for ceremonial meals may not be donated or catered.

An Inmate Request to Staff (BP-S148) must be submitted to the chaplain 60 days before the ceremonial meal requesting ritual/traditional foods. The chaplain will consult with the Food Service Administrator to develop the menu for each ceremonial or commemorative meal at least 45 days before the scheduled date of the observance. This facilitates timely food ordering and preparation.

d. **Religious Fasts.** There are generally two different types of fasts, a public and a private or personal fast. When inmates observe a public fast, i.e. one which is regulated by law or custom for all the faith adherents, Food Service will provide a meal nutritionally equivalent to the meal(s) missed.

Public fasts usually begin and end at specific times. Accommodations may also be made for bagged meals at times when Food Service is normally closed. When an inmate fasts for personal, religious reasons, no special accommodations need to be made for the meal(s) missed. Requests for meals after a personal fast should be determined on a case-by-case basis, applying sound correctional and pastoral judgment.

A list of public fast days is published annually in the OM on religious holy days, but, because of the changing nature of religious observances, it is not exhaustive.

19. **ANNUAL REPORT.** Each institution will submit an annual report to the Chaplaincy Services Branch, CPD. The reporting year will be from October 1st through September 30th. The institutions will receive the report forms each September from the Central Office Chaplaincy Branch. The appropriate Associate Warden and Warden will sign the report prior to forwarding the report to the Regional Chaplaincy Administrator.

- A signed copy of the report will be retained in the chaplain's office.

The completed reports will be sent to the Regional Chaplaincy Administrators by the third Friday in November and the Regional Chaplaincy Administrators will forward the reports to the Central Office Chaplaincy Branch by the second Friday of December. The Chaplaincy Services Branch will compile the information and provide a summary report to the Regional Directors by the second Friday of May.

20. **INSTITUTION SUPPLEMENT**. Each institution will develop an Institution Supplement for operating religious programs and activities. The Institution Supplement requires the Regional Director's approval prior to issuance and must include the following:

a. Procedures for serious illness and/or death notifications;

b. Procedures for religious fasts, ceremonial meals and whether appropriated funds will be used to supplement the ceremonial meals with traditional/ritual foods;

c. Reasons for removal from the religious diet program and procedures for religious diet program reinstatement;

d. Procedures for acquiring authorized religious items when no catalog vendor is available (i.e. eagle feathers);

e. Authorized religious property;

f. Sweat Lodge procedures, including who may participate, modesty/security requirements, and medical clearance requirements if any;

g. Procedures and limitations for pastoral visits for inmates in general population and procedures for accommodating pastoral visits for inmates in special housing or hospital units;

h. Procedures and limitations for storage and provision of religious wine;

i. Indoor and outdoor areas authorized and designated for the ritual use of tobacco; and

j. Where applicable, procedures for procuring, storing, and using tobacco for rituals.

21. **BUREAU OF PRISONS FORMS.** The following BP-Forms will be used in conjunction with this Program Statement:

- Questionnaire Regarding New or Unfamiliar Religious Components (BP-S822)
- Notification of Religious Diet Accommodation (BP-S700)
- Credentials Religious Volunteer (BP-S777)
- Credentials Religious Contractor (BP-S778)
- Notification of Religious Diet Violation (BP-S820)

22. **IMPLEMENTATION.** Implementation of this Program Statement will occur within 90 days of the effective date of this policy.

/s/
Harley G. Lappin
Director